Frank TAUCHER, et al., Plaintiffs,

v.

Brooksley E. BORN, et al., Defendants.

No. CIV A 97–1711 RMU.

United States District Court,
District of Columbia.

June 21, 1999.

### DECISION

URBINA, District Judge.

**Entering Judgment for the Plaintiffs**

A bench trial was held in the above-captioned case beginning Monday, May 3, 1999 and ending Wednesday, May 5, 1999, during which the court took testimony from various witnesses and received documents into evidence. Upon reviewing the testimony and evidence, as well as the existing record and the relevant law, the court enters the following findings of fact and conclusions of law. Based on these findings and conclusions, the court will enter judgment in this case for the plaintiffs.

## I. INTRODUCTION

This case involves a First Amendment challenge to Section 4m of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6m (1994), as applied to the plaintiffs who publish books, newsletters, Internet websites, detailed written instruction manuals (known in the industry as "trading systems"), and computer software that provide information, analysis, and advice on commodity futures trading. The plaintiff-publishers in this action seek a declaration that they may lawfully publish without being registered as commodity trading advisors ("CTA") with the Commodity Futures Trading Commission ("CFTC"). The defendants contend that the registration requirement is constitutional under the First Amendment.

Plaintiffs Frank Taucher, Stephen Briese, Frederick J. Kastead[1], and Robert Miner (hereinafter collectively referred to as "the plaintiffs") are publishers whose publications include books, newsletters, Internet websites, trading systems, and computer software. Plaintiffs Galen Cawley,

Arthur Hayner, Edward W. Hearne III, Roemer McPhee, and Roger Rines are members of the public who read and use the plaintiffs' publications and other futures-related publications.

Named as a defendant is the Commodity Futures Trading Commission ("CFTC"), the independent federal regulatory agency charged with administering and enforcing the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. 1.1 *et seq.* Also named as defendants in their official capacities are the CFTC's chairperson, Brooksley E. Born, and CFTC commissioners Barbara Pedersen Holum, David D. Spears and John E. Tull, Jr.

## II. FINDINGS OF FACT

### A. General Facts

1. Participants in the futures market rely in part on published information, recommendations and analyses in order to make trading decisions.

2. Information may be gleaned from a variety of sources including but not limited to books, newsletters, Internet websites, computer software and advisory services.

3. Commodity Trading Advisors are one of several kinds of commodity trading professionals regulated by the Commodity Futures Trading Commission.

4. CTAs who give individually tailored advice to their clients normally also manage client funds.

5. In the commodity trading advisory profession as it is practiced today, a CTA ordinarily does not devise a specific trading strategy for a particular client.

6. Most CTAs have a system, program or discipline by which they trade

---

1. Based on the factual representations regarding Mr. Kastead's publications, which were stipulated to by all parties, the CFTC has stipulated that it would not require Mr. Kastead to register with the CFTC as a commodity trading advisor.

futures contracts on their clients' behalf.

7. The CFTC requires that a CTA disclose to his clients the trading methods, strategies or disciplines he intends to use to trade for the client's account.

8. A CTA would not trade a $10,000 discretionary commodity account the same way he would trade a $100,000 account because the CTA does not have sufficient funds to trade the smaller account the same way he would trade the larger account.

9. Although a CTA will follow his trading program regardless of the size of a particular discretionary commodity account, the CTA may structure the actual trades differently in a smaller account because he has fewer funds with which to trade.

10. CTAs who manage their clients' money must execute a power-of-attorney agreement with their client which authorizes the CTA to execute trades on behalf of clients.

11. After the contract is executed, the client of a money-managing CTA does not approve or veto specific trading decisions.

12. A client of a money-managing CTA will generally not find out that a trade has been executed on his or her behalf until the client receives the next statement of account balance.

13. The CTA's trading decisions can expose the client to loss, even in excess of the initial amount invested.

14. When a client wishes to enter into a relationship with a CTA, the CTA provides the client with a disclosure document which contains, among other things, a "Risk Disclosure Statement." The Risk Disclosure Statement states, among other disclosures, that "[t]he risk of loss in trading commodities can be substantial."

15. As a general matter, money-managing CTAs do not communicate trading advice to their clients.

16. Rather, money-managing CTAs gather information and then use that information themselves to make trading decisions.

17. Individuals cannot execute trades in the market without going through a broker (known as a Futures Commission Merchant or FCM) who is licensed by the CFTC.

18. Because futures transactions are highly leveraged, a client can lose more money than he invests and, thus, the commodity trading account relationship between a client and broker involves unlimited risk on the part of the broker.

19. To insure that a client has sufficient funds to meet margin calls and cover losses in a trading account and, thus, minimize the client's potential default, the broker typically obtains from the client such financial information as assets, liabilities, net worth, liquid capital and risk capital.

20. There is no legal requirement that a CTA determine the suitability of a prospective client to engage in futures trading.

### B. Robert Miner

21. Plaintiff Robert Miner ("Miner") is a publisher of futures trading information, analysis and advice.

22. Miner does business through Dynamic Traders Group, Inc.

23. He publishes a weekly publication called *Dynamic Trader Weekly Report.*

24. In *Dynamic Trader Weekly Report* Miner provides, along with other information, his opinion of the position of various financial and commodity markets based on his technical anal-

ysis, including specific trade recommendations and "stop levels."

25. In addition to advice and recommendations, Miner also provides subscribers with a trading education; each of the reports contains a tutorial, explaining the analysis used in the trading decisions and his approach to futures trading.

26. Miner has published a book, *Dynamic Trading*, that he offers for sale to the public, which explains his approach to futures trading.

27. Miner has a website, http://dynamic-traders.com, that provides information on, and advertising for, the products and technical services offered by his company, as well as occasional technical analysis and trade recommendations.

28. Miner has published a *Dynamic Trader Trading Course*, which is a comprehensive instruction manual in commodities trading technical analysis.

29. The *Dynamic Trader Trading Course* teaches traders theory and practical application of analysis and trading strategies.

30. Miner has developed and markets a computer software program called *Dynamic Trader Software* that performs technical analysis of the financial and commodity markets.

31. The analysis provided by the *Dynamic Trader Software* reflects the technical analysis techniques described in the *Dynamic Trader Trading Course*.

32. The routines, reports and studies in the software program apply to all actively traded markets, including futures, stocks, indexes, and mutual funds.

33. The purpose of the analysis is to provide the trader with the information he or she requires in making a trading decision; the software also, within certain routines, provides buy and sell signal set-ups.

34. In order to generate meaningful trading advice, a user of the *Dynamic Trader Trading Course* or the *Dynamic Trader Software* is required to use it in conjunction with certain other information that the user supplies (the "User Input"). The User Input is made up of "Price Data" and "Parameters."

35. Price Data consists of a series of data that corresponds to the prices of a certain instrument over a certain period of time. The Price Data may be supplied on a daily, weekly or other basis. The instrument may be a futures contract or some other type of instrument. The Price Data may represent an instrument that the user already owns, an instrument that the user does not own, or purely hypothetical data.

36. The Parameters are certain numerical values that the user may select in order to "fine tune" the mathematical output of routines within the program that examine a given set of Price Data. A user will normally select the Parameters that, based on the user's knowledge or experience, are likely to lead to the most profitable or otherwise meaningful result.

37. By using the *Dynamic Trader Trading Course* or the *Dynamic Trader Software* in conjunction with a given set of Price Data and a given set of Parameters, a user obtains output which the user must then interpret by using his own skills and knowledge.

38. Neither the *Dynamic Trader Trading Course* nor the *Dynamic Trader Software* require the user to input any personal information. Specifically, they do not require the user to input information about his particular investment objectives, available capital, risk preferences, current portfolio holdings, or personal risk

exposures to fluctuations in other economic variables such as exchange rates, commodity prices, interest rates or stock market levels.

39. Every person who uses the same Price Data and Parameters in conjunction with the *Dynamic Trader Trading Course* will, if the instructions are followed correctly, receive the same output regardless of his individual needs and circumstances. Likewise, every person that uses the same Price Data and Parameters in conjunction with the *Dynamic Trader Software* will receive the same output regardless of his individual needs and circumstances.

40. Miner charges a fee to subscribers of the Dynamic Trader Weekly Report and the semimonthly Dynamic Trader Report.

41. Miner charges a fee to purchasers of his book, *Dynamic Trading,* his instruction manual, *Dynamic Trader Trading Course,* and his software program, *Dynamic Trader Software.*

42. Miner also offers issues of his *Dynamic Trader Weekly Report* at his website for a fee.

43. Through his various publications, Miner provides commodity trading advice to approximately 500 subscribers.

44. Miner distributes his several publications by various means, including mail, facsimile transmission and the Internet.

45. Miner's activities of publishing commodity trading advice are not solely incidental to his business.

46. Miner does not have discretionary control over customer accounts, nor does he execute trades on customers' behalf or otherwise manage customer money.

47. Miner's *Dynamic Trader* software is incapable of actually executing trades on behalf of a customer, or otherwise performing any trading-related activity other than causing a computer to display the output of the price data or mathematical manipulation of the price data for a user to interpret.

48. When Miner wrote and published his book, newsletters and Internet publications, he did not tailor their contents to the particular needs and circumstances of any individual reader.

49. When Miner wrote and published the *Dynamic Trader Trading Course* and the *Dynamic Trader Software,* he did not in any way tailor their contents to the particular needs and circumstances of any individual user.

50. When Miner wrote and published his book, newsletters, and Internet publications, he was unfamiliar with the particular needs and circumstances of specific individuals who might read them.

51. When Miner wrote and published the *Dynamic Trader Trading Course* and the *Dynamic Trader Software,* he was unfamiliar with the particular needs and circumstances of specific individuals who might use them.

52. Miner furnishes to every reader of his book, newsletters and Internet publications identical copies of the documents.

53. Miner furnishes to every purchaser of each edition of the *Dynamic Trader Trading Course* and the *Dynamic Trader Software* an identical copy of the manual or software.

54. Miner does not and cannot alter the contents of the *Dynamic Trader Trading Course* or the *Dynamic Trader Software* after it has been distributed to a given user.

55. At no time does Miner advise, by any medium, a specific individual user of the *Dynamic Trader Trad-*

*ing Course* or the *Dynamic Trader Software* to either ignore or follow a specific recommendation produced by the application of the course instructions or by the execution of the software program.

56. Miner does not operate, has not operated and does not intend to operate a telephone "hot line" or other medium of communication by which he would inform individual users whether they should follow or ignore specific recommendations of the *Dynamic Trader Trading Course* or the *Dynamic Trader Software*.

57. Miner's website contains an order form where users can provide information through an on-line form that is delivered electronically to Miner.

58. This information consists solely of the trading time frame that the user is interested in and the market(s) that the user is interested in.

59. Miner uses this information so that he can inform users when he has written a publication that may be of interest to them.

60. Miner does not use this information to tailor an individual trading strategy for any person.

61. The publications that Miner supplies to customers who had communicated information about their fields of interest through this portion of the website are identical to the publications that Miner supplies to other subscribers.

62. Miner believes that it would be a phenomenal task for him to retain copies of all the research and material that substantiate his trading recommendations.

63. Many of Miner's subscribers have requested that he not give their names to other parties.

64. If Miner's subscription list were ever given to a government agency, Miner believes that he would lose a tremendous amount of business due to his subscribers' negative reactions.

## C. Frank Taucher

65. Plaintiff Frank Taucher ("Taucher") is a technical analyst and the publisher of commodity trading information, technical analysis and advice. Taucher's publications are geared toward understanding and explaining cyclical market movements.

66. Taucher currently publishes *The Supertrader's Almanac, The Spread Investment Letter, The Supertrader's Book of Linear Time Cycles,* and *Trading the Four–Year Presidential Election Cycle.*

67. Taucher offers for sale two previously published books, *The Greatest Game in the World* and *The Supertrader's Almanac (Reference Manual).*

68. *The Supertrader's Almanac* is printed biannually.

69. Taucher has a website, http://www.supertraderalmanac.com, which advertises his publications and provides a free "Trade of the Week" for anyone who goes to the site.

70. Taucher has developed computer software for use by *Almanac* and *Cycle* subscribers. The software presents and builds upon many of the studies contained in his publications. The software analyzes futures markets and generates trading analysis and recommendations. If offered to the public for sale, the software would be used in conjunction with data updates provided over the Internet and on his website. Taucher does not currently offer this software for sale to the public.

71. In order to generate meaningful trading advice, a user of Taucher's instruction manuals is required to use it in conjunction with certain other information that the user sup-

plies (the "User Input"). The User Input is made up of "Price Data."

72. Price Data consists of a series of data that corresponds to the prices of a certain instrument over a certain period of time. The Price Data may be supplied on a daily, weekly, or other basis. The instrument may be a futures contract or some other type of instrument. The Price Data may represent an instrument that the user already owns, an instrument that the user does not own, or purely hypothetical data.

73. By using Taucher's instruction manuals in conjunction with a given set of Price Data, a user obtains either a specific trading recommendation or other meaningful output, which the user must then interpret by using his own skills and knowledge.

74. Taucher's instruction manuals do not require the user to input any personal information. Specifically, they do not require the user to input information about his/her particular investment objectives, available capital, risk preferences, current portfolio holdings, or personal risk exposures to fluctuations in other economic variables such as exchange rates, commodity prices, interest rates or stock market levels.

75. Every person who uses the same Price Data in conjunction with Taucher's instruction manuals will, if the instructions are followed correctly, receive the same recommendation (or other output) regardless of his/her individual needs and circumstances.

76. Taucher charges a fee to the subscribers or purchasers of each of his publications listed above.

77. Taucher would also like to offer recommendations at his website only to viewers who pay a fee.

78. Taucher provides information on his website that is useful only when used in conjunction with printed materials which must be purchased from Taucher.

79. Through his various publications, Taucher provides commodity trading advice to more than 15 individuals.

80. Taucher distributes his several publications by various means, including mail, facsimile transmission and the Internet.

81. Taucher's activities of publishing commodity trading advice are not solely incidental to his business.

82. Taucher does not have discretionary control over customer accounts, nor does he execute trades on customers' behalf or otherwise manage customer money.

83. When Taucher wrote and published his books, newsletters and Internet publications, he did not in any way tailor their contents to the particular needs and circumstances of any individual reader.

84. When Taucher wrote his trading systems, he did not in any way tailor their contents to the particular needs and circumstances of any individual user.

85. When Taucher wrote and published his book, newsletter, and Internet publications, he was unfamiliar with the particular needs and circumstances of specific individuals who might read them.

86. When Taucher wrote and published his trading systems, he was unfamiliar with the particular needs and circumstances of specific individuals who might use them.

87. Taucher furnishes identical copies to every reader of his books, newsletters, and Internet publications.

88. If he offers his currently unpublished trading systems or software for general sale, Taucher intends to furnish to every purchaser an identical copy of the system or software.

89. If he offers his currently unpublished trading systems or software for general sale, he does not intend to and will not be able to alter the contents of the system or software after it has been distributed to a given user.

90. Plaintiff Frank Taucher's publication, *The Supertraders' Almanac,* contains an advertisement for a broker.

91. Taucher's publication, *The Greatest Game in the World,* contains referral information for four brokers.

92. Taucher has, in the past, referred subscribers of his publication, *The Seasonal Trade Portfolio,* to a broker.

93. Taucher does not have authority over the accounts managed by these, or any other, brokers.

94. Taucher does not have the authority to execute trades on behalf of any subscriber who might have an account with these, or any other, brokers.

95. These brokers do not obtain Taucher's consent or approval before executing trades.

96. Taucher does not have knowledge of the trading activity that goes on in the accounts managed by these, or any other, brokers.

97. Taucher does not decide which broker to refer a subscriber to based upon that subscriber's individual circumstances.

98. Taucher required purchasers of *The Seasonal Trade Portfolio* to sign a contract that required the purchasers to assert, among other things, that they had sufficient risk capital and that the risks of losses would be "acceptable losses given the buyer's family, business, emotional, financial, mental, physical situation and age."

99. Taucher neither assessed nor received any information regarding a potential subscriber's family, business, emotional, financial, mental or physical situation or age.

100. Taucher's intent in this contract was that the potential subscriber or his personal advisor would conduct an analysis to determine the validity of the assertions made in the contract.

101. Taucher did not tailor the contents of *The Seasonal Trade Portfolio* to any individual subscriber.

102. Every subscriber to *The Seasonal Trade Portfolio* received an identical copy of the publication.

103. One of the four payment options for the *Portfolio* was based in part upon "billable profits."

104. "Billable profits" was an abstract calculation based upon theoretical prices. The theoretical prices were calculated using the average open, close, high and low prices on the recommended entry and exit dates, and on a theoretical trade involving only one contract.

105. "Billable profits" could differ dramatically from the actual profits realized by a subscriber for reasons including the different market timing systems that each user used to determine when exactly to place a trade, the fact that subscribers could trade different numbers of contracts, and the fact that brokerage fees would vary between customers.

106. The fee charged to each subscriber under this option would be the same regardless of the actual profits realized by each subscriber.

107. Taucher does not advise, by any medium, specific individual users of his trading system to either ignore or follow a specific trading recommendation produced by the application of the system.

108. If Taucher offers his currently unpublished trading systems or software for general sale, he does not intend to advise, by any medium, a

specific individual user of the system or software to either ignore or follow a specific recommendation produced by the execution of the software.

109. Taucher does not operate, has not operated, and does not intend to operate a telephone "hot line" or other medium of communication by which he would inform individual users whether they should follow or ignore specific recommendations of his trading systems or software.

110. Taucher believes that audits of his home-based business would be highly invasive of his privacy, and objects to being subjected to such audits if he registers.

111. Taucher receives communications from his subscribers which specifically instruct him not to divulge their names to government agencies.

112. Taucher believes that his customers would be extremely angry with him if he had to turn over his subscriber list, and that he might suffer devastating financial damage.

113. Taucher believes that if the CFTC used his subscriber list to contact any of his customers, his customers would automatically assume that he had engaged in some sort of unlawful activity.

## D. Stephen Briese

114. Plaintiff Stephen Briese ("Briese") is the publisher of *Bullish Review,* a biweekly newsletter that analyzes the CFTC's "Commitments of Traders Report."

115. Based on extremes in net trader positions from the "Commitments of Traders Report" and other indicators, *Bullish Review* highlights futures markets that may be due for a trend change.

116. Briese obtains the data analyzed in *Bullish Review* from the "Commitments of Traders Report" pro-

vided by the CFTC at its Internet website.

117. In the "Commitments of Traders Report," the CFTC summarizes weekly, and releases biweekly, data on the open interest in markets in which five or more traders hold positions equal to or above the reporting levels established by the agency.

118. Briese offers a website service, http://BullishReview.com, that provides price charts based on the "Commitments of Traders Report," current and past issues of *Bullish Review* (available for a fee), *Pitpoints* (a computer-generated listing of short-term trading signals, available for a fee), the *JAVA Charting* program (available for a fee), a Subscriber's Guide and information and advertising for *Bullish Review.*

119. On Briese's website, paid subscribers, through a password system, can receive current and recent issues of *Bullish Review* and preprinted weekly price charts that unpaid visitors cannot obtain.

120. Briese has also developed computer software programs, including *CrossCurrent,* that analyze futures markets and generate trading analysis and recommendations based on real or hypothetical market data.

121. *CrossCurrent* is a currency-spread trading system that produces buy and sell signals for various currency spreads.

122. In order to generate meaningful trading advice, a user of the *CrossCurrent* software is required to use it in conjunction with certain other information that the user supplies (the "User Input"). The User Input is made up solely of "Price Data."

123. Price Data consists of a series of data that corresponds to the prices of certain instruments over a certain period of time. The Price Data is supplied on a daily basis. The instruments are futures contracts on various currencies. The Price Data may represent an instrument that the user already owns, an instrument that the user does not own, or purely hypothetical data.

124. By using the *CrossCurrent* software in conjunction with a given set of Price Data, a user obtains either a specific trading recommendation or another meaningful output which the user must then interpret by using his own skills and knowledge.

125. The *CrossCurrent* software does not require the user to input any personal information. Specifically, it does not require the user to input information about his particular investment objectives, available capital, risk preferences, current portfolio holdings or personal risk exposures to fluctuations in other economic variables such as exchange rates, commodity prices, interest rates or stock market levels.

126. Every person who uses the same Price Data in conjunction with the *CrossCurrent* software will receive the same recommendation (or other output) regardless of his individual needs and circumstances.

127. Briese charges a fee to the subscribers of *Bullish Review.*

128. Briese also charges a fee in order for a reader to gain access to some of the information on his website.

129. Through his various publications, Briese provides commodity trading advice to more than 15 individuals.

130. Briese distributes his several publications by various means, including mail, facsimile transmission and the Internet.

131. Briese's activities of publishing commodity trading advice are not solely incidental to his business.

132. Briese does not have discretionary control over customer accounts, nor does he execute trades on customers' behalves or otherwise manage customer money.

133. Briese's software is incapable of actually executing trades on behalf of a customer or otherwise performing any trading-related activity other than causing a computer to display a trading recommendation or other piece of information for a user to interpret.

134. When Briese writes and publishes his newsletters and Internet publications, he does not in any way tailor their contents to the particular needs and circumstances of any individual reader.

135. When Briese wrote the *CrossCurrent* software, he did not in any way tailor its contents to the particular needs and circumstances of any one prospective user of the software.

136. When Briese writes and publishes his newsletters and Internet publications, he is unfamiliar with the particular needs and circumstances of specific individuals who might read them.

137. When Briese wrote the *CrossCurrent* software, he was unfamiliar with the particular needs and circumstances of specific individuals who might use it.

138. Briese furnishes identical copies to every reader of his newsletters and Internet publications.

139. Briese furnished to every purchaser of his *CrossCurrent* software an identical copy of the program.

140. Briese did not and could not alter the contents of the *CrossCurrent* software after it had been distributed to a given user.

141. Stephen Briese has, in the past, referred subscribers to a broker.

142. Briese does not have authority over the accounts managed by this, or any other, broker.

143. Briese does not have the authority to execute trades on behalf of any subscriber who might have an account with this, or any other, broker.

144. This broker does not obtain Briese's consent or approval before executing trades.

145. Briese does not have knowledge of the trading activity that goes on in the accounts managed by this, or any other, broker.

146. Briese does not decide which broker to refer a subscriber to based upon that subscriber's individual circumstances.

147. At no time did Briese advise, by any medium, a specific individual user of the *CrossCurrent* software to either ignore or follow a specific recommendation produced by the execution of the software program.

148. Briese does not operate, has not operated and does not intend to operate a telephone "hot line" or other medium of communication by which he would inform individual users whether they should follow or ignore specific recommendations of his trading systems or software.

149. For fear of further violating Section 4m, Briese has offered his software only on an extremely limited basis; he no longer offers any computer software trading systems for sale.

150. Individuals have asked Briese to sell *CrossCurrent* once again, but he will not do so due to fear of further violating the registration requirement.

151. Although Briese cannot give a precise estimation of his losses, he has been economically damaged due to his inability to sell his trading software.

152. Briese believes more individuals would subscribe to *Bullish Review* if he engaged in more advertising, which he has restricted due to fear of CFTC enforcement of the registration requirement.

153. For fear of further violating Section 4m, Briese has published in *Bullish Review* only general impersonal trading recommendations and does not offer specific trading advice.

154. For fear of further violating Section 4m, Briese is seriously considering changing his commentary from futures markets to securities, where impersonal publishers receive full First Amendment protection.

155. Briese believes that CFTC audits conducted in his home would be a serious invasion of his privacy.

## III. CONCLUSIONS OF LAW

### A. Commodity Exchange Act Registration Requirement

This case involves a constitutional challenge to the Commodity Futures Trading Commission's ("CFTC") application of certain portions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* Specifically, the plaintiffs challenge the CFTC's application of the CEA's registration requirement, 7 U.S.C. § 6m(1), to individuals who publish and sell information about futures trading. The registration requirement at issue provides that "[i]t shall be

unlawful for any commodity trading advisor ..., *unless registered under this chapter*, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor ..., provided that the provisions of this section shall not apply to any commodity trading advisor who, during the course of the preceding twelve months, has not furnished commodity trading advice to more than fifteen persons and who does not hold himself out generally to the public as a commodity trading advisor." 7 U.S.C. § 6m(1) (emphasis added).

As stated in 7 U.S.C. § 6m(1), the CEA's registration requirement applies only to persons who are classified as commodity trading advisors. A commodity trading advisor is defined in the CEA as any person who

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in—

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

(II) any commodity option authorized under section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

7 U.S.C. § 1a(5)(A). Excluded from this definition is "the publisher or producer of any print or electronic data of general and regular dissemination, including its employees." 7 U.S.C. § 1a(5)(B)(iv). This exclusion applies, however, "only if the furnishing of such services by persons referred to in subparagraph (B) is solely incidental to the conduct of their business or profession." 7 U.S.C. § 1a(5)(C).

Each of the plaintiffs in this case falls squarely within the definition of a CTA. They engage in the business of advising others, through publications, writings and electronic media, as to the value of or the advisability of trading in the futures market, and they do so for compensation or profit. Moreover, they are not excluded as publishers or producers of print or electronic data of general and regular dissemination because the furnishing of such services is *not* solely incidental to the conduct of their business or profession. To the contrary, the furnishing of such services is the plaintiffs' primary business or profession.

Accordingly, as persons who meet the definition of a CTA and who furnish commodity trading advice to more than fifteen persons per year, the plaintiffs are required to register with the CFTC pursuant to 7 U.S.C. § 6m(1). Failure to do so may result in conviction for "a felony punishable by a fine of not more than ... $500,000 ... [for] an individual or imprisonment for not more than five years, or both, together with the costs of prosecution ...." 7 U.S.C. § 13(a)(5).

Registration with the CFTC involves, among other requirements, filing an application with the National Futures Association ("NFA") and paying an annual fee of $100. *See* 7 U.S.C. § 6n; 17 C.F.R. § 3.1 *et seq.* Additional conditions placed upon registrants include: attending four hours of ethics training the first year and an additional hour every three years thereafter, maintaining books and records which are subject to inspection by the CFTC, and filing reports as directed by the CFTC. *See id.* Moreover, the CFTC is authorized to deny registration to applicants in accordance with 7 U.S.C. § 12a, which states in part:

The Commission is authorized—

\*  \*  \*  \*  \*  \*

(2) upon notice, but without a hearing and pursuant to such rules, regulations, or orders as the Commission may adopt,

to refuse to register, to register conditionally, or to suspend or place restrictions upon the registration of, any person and with such a hearing as may be appropriate to revoke the registration of any person [who meets the criteria listed in 7 U.S.C. § 12a(2)(A)-(H) ].

Among those to whom registration may be refused pursuant to 7 U.S.C. § 12a(2) are persons who previously had their registration with the CFTC suspended or revoked; were convicted within ten years for certain felonies, including felonies related to the commodity futures or the securities business; failed to reasonably supervise another person who was subject to their supervision; or violated the CEA or federal or state securities laws. Moreover, 7 U.S.C. § 12a(3)(M) authorizes the CFTC to "refuse to register or to register conditionally any person, if it is found, after opportunity for hearing, that ... there is other good cause." In an Interpretative Statement, the CFTC has explained that:

> In general, the Commission interprets paragraph (M) to authorize the Commission to affect the registration of any person if, as a result of any act or pattern of conduct attributable to such person, although never the subject of formal action or proceeding before either a court or governmental agency, such person's potential disregard of or inability to comply with the requirements of the [Commodity Exchange] Act or the rules, regulations or order thereunder, or such person's moral turpitude, or lack of honesty or financial responsibility is demonstrated to the Commission. Any inability to deal fairly with the public and consistent with just and equitable principles of trade may render an applicant or registrant unfit for registration, given the high ethical standards which must prevail in the industry.

7 C.F.R. Part 3, App. A.

Among the plaintiffs in this case, only Robert Miner is currently registered with the CFTC as a CTA. All of the plaintiffs, including Mr. Miner, argue that the application of the CEA's registration requirement to them constitutes a violation of their rights under the First Amendment of the United States Constitution. The CFTC maintains, on the other hand, that the registration requirement constitutes the permissible regulation of a profession, and its application to the plaintiffs does not run afoul of the Constitution. Thus, as Justice White noted in his concurrence in *Lowe v. Securities and Exchange Commission*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), this case "involves a collision between the power of the government to license and regulate those who would pursue a profession or vocation and the rights of freedom of speech and the press guaranteed by the First Amendment." *Id.* at 228, 105 S.Ct. 2557 (White, J., concurring in the result).

## B. Regulation of Speech Versus Regulation of a Profession

In general, the government may regulate entry into a profession as long as the regulations imposed " 'have a rational connection with the applicant's fitness or capacity to practice' the profession." *Lowe*, 472 U.S. at 228, 105 S.Ct. 2557 (White, J., concurring in the result) (quoting *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)). This is so even if the profession that the government seeks to regulate involves speech. *See Lowe*, 472 U.S. at 228, 105 S.Ct. 2557. There comes a point, however, where government legislation crosses the line between the regulation of a profession and the regulation of speech. It is at this point where the protections of the First Amendment are invoked and the regulation becomes subject to a less deferential level of judicial scrutiny. *See id.*

The first question for the court to decide in this case, therefore, is whether by applying the CEA's registration requirement to the plaintiffs the CFTC is engaging in the regulation of a profession or the regulation of speech. This is a question with which courts have struggled in the past in

an effort to articulate a principled way of distinguishing between the two kinds of regulations. In 1945, for example, the Supreme Court was faced with a controversy that required it to distinguish between a state's right to regulate the profession of labor organizers and the organizers' rights to lawfully address workers regarding their labor grievances. *See Thomas v. Collins*, 323 U.S. 516, 544, 65 S.Ct. 315, 89 L.Ed. 430 (1945). In a concurring opinion, Justice Jackson drew the following distinction between the regulation of a profession and the regulation of speech:

> Though the one may shade into the other, a rough distinction always exists, I think, which is more shortly illustrated than explained. A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, the state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought. So the state to an extent not necessary now to determine may regulate one who makes a business or a livelihood of soliciting funds or memberships for unions. But I do not think it can prohibit one, even if he is a salaried labor leader, from making an address to a public meeting of workmen, telling them their rights as he sees them and urging them to unite in general or to join a specific union.

*Thomas*, 323 U.S. at 544–45, 65 S.Ct. 315 (Jackson, J., concurring), *quoted in Lowe*, 472 U.S. at 231, 105 S.Ct. 2557.

More recently, in *Lowe*, the Supreme Court was faced with a challenge to the Securities and Exchange Commission's application of the registration requirement in the Investment Advisers Act. *See Lowe*, 472 U.S. 181, 105 S.Ct. 2557. As in the instant case, the plaintiffs in *Lowe* argued that the registration requirement constituted an impermissible regulation of speech, while the defendant argued that it was properly considered a regulation upon a profession. Convinced that it was necessary for the Court to reach the constitutional question presented to it, Justice White endeavored to "locate the point where regulation of a profession leaves off and prohibitions on speech begin." *Lowe*, 472 U.S. at 232, 105 S.Ct. 2557. He drew the distinction as follows:

> One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession. If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny. Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

*Lowe*, 472 U.S. at 232, 105 S.Ct. 2557 (White, J., concurring in the result). Guided by the writings of Justice Jackson and Justice White, this court concludes that the CFTC's application of the CEA's regis-

tration requirement to the plaintiffs in this case constitutes an attempt to regulate speech, not a profession.

There are several facts that lead the court to this conclusion. The plaintiffs, through their publishing activities, do not go so far as to "exercise judgment" on behalf of those who purchase their products. Through their products, they provide advice on commodities futures trading strategies and techniques; they sell trading systems designed to influence their customers' trading decisions; in some instances, they even go so far as to offer specific buy and sell recommendations; but their advice and recommendations are identical for every customer and their products are available to all who wish to purchase them. Moreover, the plaintiffs never have any personal contact with their customers. They never supplement their general recommendations with specific recommendations directed at individual customers. They never make trades for their customers. They simply sell their products and leave it to their customers to decide for themselves whether and how they will use the advice and recommendations purchased from the plaintiffs.

This is similar to the factual scenario in *Lowe.* There, the petitioner did not "offer his subscribers investment advice specifically tailored to their individual needs and engage[d] in no direct communications with them." *Lowe,* 472 U.S. at 214, 105 S.Ct. 2557. Nevertheless, "he undeniably engage[d] in the business of advising others through publications as to the value of securities and issue[d] or promulgate[d] analyses or reports concerning securities." *Id.* (internal quotations omitted). Based on these facts, the concurring justices opined that "[t]he application of the [Investment Advisers] Act's enforcement provisions to prevent unregistered persons from engaging in the business of publishing investment advice for the benefit of any who would purchase their publications ... [was] a direct restraint on freedom of speech and of the press subject to the searching scrutiny called for by the First Amendment." *Id.* at 233, 105 S.Ct. 2557.

Given similar facts, the United States District Court for the Southern District of New York reached a different conclusion in *Commodity Futures Trading Commission v. AVCO Financial Corp.,* 979 F.Supp. 232 (S.D.N.Y.1997), a case involving the CFTC's application of the same registration requirement at issue in this case. In *AVCO,* however, the investment advice went beyond that provided by the plaintiffs here. AVCO not only provided specific buy and sell recommendations; it also provided a telephone number that customers could call to receive additional advice about AVCO's general recommendations and it provided customers "a service by which brokers authorized by AVCO c[ould] actually make trades" for AVCO's customers. *AVCO,* 979 F.Supp. at 237. According to the AVCO court, these facts "negate[d] [AVCO's] assertions that AVCO's investment advice [was] entirely impersonal and not characteristic of investment adviser-client relationships meant to be covered by the CEA." *Id.*

In contrast to the defendants in *AVCO,* the plaintiffs here never engage in individual consultations with their customers regarding their standard advice and recommendations and under no circumstances do they make trades for their customers. Indeed, their customers must go through some other licensed broker before they can act on any of the plaintiffs' recommendations. On these facts, this court cannot conclude that the plaintiffs are "exercising judgment" on behalf of their customers.

Moreover, a determination that the CFTC's application of the registration requirement challenged in the instant case constitutes the regulation of speech and not a profession comports with Justice Jackson's reasoning in *Thomas.* Explaining the rationale behind giving the government more power to regulate a profession than to regulate speech, Justice Jackson stated:

This wider range of power over pursuit of a calling than over speech-making is due to the different effects which the two have on interests which the state is empowered to protect. The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system.

But it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us. Nor would I. Very many are the interests which the state may protect against the practice of an occupation, very few are those it may assume to protect against the practice of propagandizing by speech or press. These are thereby left great range of freedom.

*Thomas,* 323 U.S. at 545, 65 S.Ct. 315 (Jackson, J., concurring) (internal citations omitted). In the instant case, the CFTC is attempting to protect the public against false doctrine. That is, the Commission seeks to protect the public from obtaining and acting upon advice and recommendations offered by persons who it believes are not adequately qualified. In this regard, the CFTC is attempting to act as the "watchman for truth" for the public.

It is true that the plaintiffs seek to obtain money from their customers and, to that extent, they are pursuing a calling. Their calling, however, is the selling of ideas, not the trading of commodity futures, and they obtain money by selling their products irrespective of whether or not their customers ever trade in the commodity futures market. Because the plaintiffs do not profit from their customers' gains or losses in the market and because the plaintiffs do not exercise judgment on behalf of their customers, the court concludes that their publications fall within the definition of protected speech.

Justice Jackson stated in *Thomas* that modern regulators sought, at times successfully, to regulate speech by "associating the speaking with some other factor which the state may regulate so as to bring the whole within official control." *Thomas,* 323 U.S. at 547, 65 S.Ct. 315. Here, the CFTC seeks to associate the plaintiffs' speech with the commodity trading advice profession so as to bring the speech within its official control. In such a circumstance, it is the court's duty to "inquire whether [the] speech or publication is properly condemned by association; [otherwise the court's] claim to guardianship of free speech and press is but a hollow one." *Id.* In this case, the court concludes that the CFTC's attempted association is not valid and its application of the CEA's registration requirement to the plaintiffs is an effort to regulate speech, not an extension of the CFTC's official duty to regulate the commodity futures trading profession. Accordingly, the court must analyze the CFTC's application of the registration requirement under the strictures of the First Amendment.

### C. First Amendment Analysis

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press ...." U.S. Const. amend. I. Not all restrictions on speech are impermissible, however, and not all kinds of speech are protected to the same extent. *See Lowe,* 472 U.S. at 233, 105 S.Ct. 2557. In contrast to fully protected speech, speech that

is considered "commercial" may be regulated by the government provided that the regulations are "narrowly tailored to advance a legitimate governmental interest." *Id.* at 234, 105 S.Ct. 2557. In order to assess the constitutional validity of the CFTC's application of the CEA's registration requirement, therefore, it is necessary for the court to determine first whether the plaintiffs' publications constitute fully protected speech or commercial speech.

### 1. Commercial Versus Fully Protected Speech

■ The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Speech is not automatically considered commercial, however, "simply because it concerns economic subjects or is sold for a profit." *Commodity Trend Service, Inc. v. Commodity Futures Trading Commission,* 149 F.3d 679, 684 (7th Cir.1998) (citing to "[a] long line of Supreme Court cases") [hereinafter *CTS, Inc.*]. Traditionally, only speech "which does no more than propose a commercial transaction" has been considered commercial speech for the purposes of the First Amendment. *CTS, Inc.,* 149 F.3d at 684.

The most typical form of commercial speech is advertising. *See id.* (noting that "[c]ommercial advertising constitutes paradigmatic commercial speech under the Supreme Court's standard because its fundamental purpose is to propose an economic transaction"); *see also Central Hudson,* 447 U.S. at 561, 100 S.Ct. 2343 (classifying "promotional advertising" as commercial speech); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 637, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (noting that "[w]hatever else the category of commercial speech may encompass, it must include appellant's advertisements"). Although *Central Hudson* can be read to expand the definition of

commercial speech beyond advertising, the Supreme Court has "not utilized the broader test [articulated in *Central Hudson*] in its recent commercial speech cases." *CTS, Inc.,* 149 F.3d at 684 (citing *Cincinnati v. Discovery Network Inc.,* 507 U.S. 410, 422, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). It is not necessary for this court to determine the intended breadth of the Supreme Court's definition of commercial speech, however, because under either a narrow or broad definition the court concludes that the plaintiffs' publications do not constitute commercial speech.

In *CTS, Inc.,* the Seventh Circuit was faced with deciding whether or not the publications of a financial publishing corporation constituted commercial speech. According to the record before the court, CTS distributed

> a number of publications concerning the commodity futures markets. These publications c[a]me in the form of books, periodicals, updates by facsimile, voice recordings accessible by telephone, and materials that c[ould] be downloaded via the Internet. The content of CTS's publications ... include[d] "securities and commodities market charts, market commentary, and educational publications concerning markets and trading." All of these publications furnish[ed] only impersonal advice; CTS d[id] not provide personalized financial planning services or trading advice tailored to the individual needs of any particular subscribers.

*CTS, Inc.,* 149 F.3d at 682. The court concluded based on these facts that CTS's publications were "not commercial speech because they do not propose a commercial transaction between CTS and a specific customer." *Id.* at 686. Rather, they provided "information on commodity trading in general and le[ft] any actual trading to other parties." *Id.* at 685–86. The same is true in the instant case. The plaintiffs' publications in this case do not propose any commercial transaction between the plaintiffs and their customers and the pub-

lications are not related solely to the economic interests of the plaintiffs and their customers. Like the publications in *CTS, Inc.*, the various publications distributed by the plaintiffs here provide impersonal information and provide the exact same advice and recommendations to all customers, regardless of any customer's individual circumstances.

It is true that portions of the plaintiffs' publications, particularly their Internet websites, include material that is appropriately classified as advertisements for their publications. The inclusion of such advertising material in an otherwise non-commercial publication, however, does not render that publication commercial speech. As the Seventh Circuit stated in *CTS, Inc.*, "[a] speaker's publication does not lose its status as protected speech simply because the speaker advertises the publication. An advertisement is a separate publication and does not strip the promoted publication of its First Amendment protection." *CTS, Inc.*, 149 F.3d at 685 (citing *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 760–61, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). In the instant case, the CFTC is seeking not to regulate the plaintiffs' advertisements, but rather to apply the CEA's registration requirement in such a way as to prevent the plaintiffs from publishing any of the information contained in their publications without first obtaining a license. The relevant inquiry, therefore, is not whether the plaintiffs' advertisements are commercial speech, but whether the substance of the plaintiffs' publications is commercial speech. For the reasons outlined above, the court concludes that it is not.

### 2. Prior Restraint as a Restriction on Speech

■ Having concluded that the plaintiffs' publications constitute fully protected speech, the court must next determine whether the restriction imposed upon the plaintiffs' speech by application of the CEA's registration requirement is permis-

sible under the First Amendment. In this case, the restriction amounts to a licensing scheme that requires the plaintiffs to first register with the CFTC before they may engage in their publishing activities. Such licensing schemes have generally been classified as prior restraints on speech. *See, e.g., Broadway Distributors, Inc. v. White*, 307 F.Supp. 1180, 1184 (D.Mass. 1970) (concluding that city ordinance prohibiting unregistered persons from selling "adult" books was invalid "on its face and in all its parts" as a prior restraint on the plaintiffs' First Amendment rights).

A prior restraint "arises in those situations where the government limitation, expressed in statute, regulation, or otherwise, undertakes to prevent future publication or other communication without advance approval of an executive official." *Times Film Corp. v. Chicago*, 365 U.S. 43, 56, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (Warren, C.J., dissenting) (quoting Thomas I. Emerson, *The Doctrine of Prior Restraint*, 20 Law & Contemp. Prob. 648, 655). While not all restrictions on speech are impermissible, a restriction that imposes a prior restraint on speech "comes to th[e] Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Indeed, courts allow this " 'most extraordinary remedy' only where the evil that would result from the [speech] is both great and certain and cannot be militated by less intrusive measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994) (quoting *Nebraska Press Association v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)). In the instant case, the court concludes that the CEA's registration requirement, as applied to the plaintiffs by the CFTC, is an unconstitutional prior restraint on speech.

The Supreme Court alluded to the correctness of such a conclusion in *Lowe* when it interpreted an almost identical provision

of the Investment Advisers Act to not include publishers of impersonal investment advice. The majority's reasoning for interpreting the language of the statute in such a way was, in part, based on its belief that "Congress, plainly sensitive to First Amendment concerns, wanted to make clear that it did not seek to regulate the press through the licensing of nonpersonalized publishing activities." *Lowe,* 472 U.S. at 204, 105 S.Ct. 2557. The Court then went on to discuss "two major First Amendment cases," *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) and *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), in which the Court struck down a state statute and a city ordinance, respectively, as unconstitutional prior restraints on publication. *Lowe,* 472 U.S. at 204–05, 105 S.Ct. 2557.

Unlike the majority, the concurring justices in *Lowe* directly concluded that the registration requirement of the Investment Advisers Act, as applied to publishers of impersonal investment advice, was an impermissible prior restraint. They stated:

> [T]he First Amendment permits restraints on speech only when they are narrowly tailored to advance a legitimate governmental interest. The interest here is certainly legitimate: the Government wants to prevent investors from falling into the hands of scoundrels and swindlers. The means chosen, however, is extreme. Based on petitioner's past misconduct, the Government fears that he may in the future publish advice that is fraudulent or misleading; and it therefore seeks to prevent him from publishing any advice, regardless of whether it is actually objectionable. Our commercial speech cases have consistently rejected the proposition that such drastic prohibitions on speech may be justified by a mere possibility that the prohibited speech will be fraudulent.

*Lowe,* 472 U.S. at 234–35, 105 S.Ct. 2557 (Jackson, J., concurring).

As in *Lowe,* the defendants in this case have imposed a drastic prohibition on speech based on the mere possibility that the prohibited speech will be fraudulent. As applied by the CFTC, the CEA imposes a ban on the plaintiffs' publishing of impersonal commodity futures trading advice unless they register with the CFTC. Moreover, the CFTC may, within its discretion, refuse to register any applicant for various reasons enumerated at 7 U.S.C. § 12a, including that the Commission believes the applicant has the "potential" to disregard the requirements of the CEA or has demonstrated "moral turpitude, or lack of honesty or financial responsibility." *See* 7 U.S.C. §§ 12a(2), 12a(3); 7 C.F.R. Part 3, App. A. This is no different than the regulation in *Lowe* in that it seeks to prevent individuals from publishing information based solely on a fear that someone may publish advice that is fraudulent or misleading, regardless or whether or not the information published actually is fraudulent or misleading. Such a prior restraint on fully protected speech cannot withstand the searching scrutiny of the First Amendment. Accordingly, the court concludes that the registration requirement of the CEA as applied to restrict the plaintiffs from engaging in their publishing activities constitutes an impermissible prior restraint upon the exercise of free speech and runs afoul of the First Amendment of the United States Constitution.

## IV. Conclusion

For the foregoing reasons the court concludes that Section 6m(1) of Title 7 of the United States Code is unconstitutional as applied to the plaintiffs in this case and, accordingly, enters judgment in favor of the plaintiffs. An appropriate Order directing the parties in a fashion consistent with this Decision is separately and contemporaneously executed and issued this 21st day of June, 1999.

## *ORDER*

### Entering Judgment for the Plaintiffs

For the reasons stated in the court's Decision separately and contemporaneous-

ly executed and issued this 21st day of June, 1999, it is

**ORDERED** that judgment be and hereby is entered in the above-captioned case in favor of the plaintiffs.

SO ORDERED.