**Frank TAUCHER, et al., Plaintiffs,**

v.

**William J. RAINER, et al., Defendants.**

**Civil Action No. 97–1711 (RMU/JMF).**

United States District Court,
District of Columbia.

Dec. 18, 2002.

Clint Bolick, William H. Mellor, Scott G. Bullock, Washington, DC, for Plaintiffs.

William S Liebman, Michael J. Garawski, Martin B. White, Washington, DC, for Defendants.

Michael E. Schoeman, Schoeman Marsch & Updike, LLP, New York, NY, Jane Elizabeth Kirtley, Arlington, VA, for Movant.

## MEMORANDUM OPINION

FACCIOLA, Magistrate Judge.

This matter is before me upon the application of the plaintiffs for attorney fees.

### BACKGROUND

Plaintiffs are ten small commodity advisory publishers and their subscribers. Defendants are the Commodity Futures Trading Commission ("CFTC") and its commissioners. The District Court held for plaintiffs and plaintiffs then sought attorneys fees under the Equal Access to Justice Act ("EAJA"). After reviewing plaintiffs' first application for attorneys fees, I held that plaintiffs, not plaintiffs' *pro bono* counsel were the real parties in

interest.[1] I then denied plaintiffs' application without prejudice pending supplemental briefing on the issue of plaintiffs' eligibility for attorneys fees under EAJA.

## DISCUSSION

### District Court's Decision

Under 7 U.S.C.A. § 6 m(10) (1999), commodity trading advisors ("CTAs") are required to register with the CFTC if they intend to make use of any means of interstate commerce in order to provide their services.

The district court (Urbina, J.,) first determined that the publishers were CTA's. *Taucher v. Born*, 53 F.Supp.2d 464, 475 (D.D.C.19998). Having then concluded that the CFTC was engaged in the regulation of the publishers' speech rather than the regulation of their profession, the court then considered whether the speech being regulated was commercial speech, subject to being regulated so long as the regulations were narrowly tailored to advance legitimate government interests. The court concluded that the publications at issue were not commercial speech since they did not propose a commercial transaction between the publishers and their subscribers and since they were not solely concerned with the economic interests of the publishers and their subscribers.[2] *Id.* at 480–81. Thus, the court concluded that the speech at issue was subject to the greatest protection afforded under the Constitution. *Id.* at 481.

Finally, the court considered whether the imposition of the Commodity Exchange Act's ("CEA") registration requirement was an impermissible prior restraint

on speech. The court determined that it was:

> [T]he defendants in this case have imposed a drastic prohibition on speech based on the mere possibility that the prohibited speech will be fraudulent. As applied by the CFTC, the CEA imposes a ban on the plaintiffs' publishing of impersonal commodity futures trading advice unless they register with the CFTC. Moreover, the CFTC may, within its discretion, refuse to register any applicant for various reasons enumerated at 7 U.S.C. § 12a, including that the Commission believes the applicant has the "potential" to disregard the requirements of the CEA or has demonstrated "moral turpitude, or lack of honesty or financial responsibility." See 7 U.S.C. §§ 12a(2), 12a(3); 7 C.F.R. Part 3, App. A. This is no different than the regulation in *Lowe* [*v. SEC, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985)* ] in that it seeks to prevent individuals from publishing information based solely on a fear that someone may publish advice that is fraudulent or misleading, regardless or whether or not the information published actually is fraudulent or misleading. Such a prior restraint on fully protected speech cannot withstand the searching scrutiny of the First Amendment.

*Id.* at 482.

Earlier, the court had explained the derivation of the "searching scrutiny" it was obliged to conduct as a result of controlling Supreme Court opinions:

> A prior restraint "arises in those situations where the government limitation, expressed in statute, regulation, or oth-

---

1. *Taucher v. Rainer*, 150 F.Supp.2d 24 (D.D.C.2001).

2. The court also noted that the mere presence of advertisements within the otherwise non-

commercial publication was not significant enough to effect the publications' overall classification as fully protected speech. *Id.* at 481.

erwise, undertakes to prevent future publication or other communication without advance approval of an executive official." *Times Film Corp. v. Chicago, 365 U.S. 43, 56, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961)* (Warren, C.J., dissenting) (quoting Thomas I. Emerson, *The Doctrine of Prior Restraint*, 20 Law & Contemp. Prob. 648, [——51] 655). While not all restrictions on speech are impermissible, a restriction that imposes a prior restraint on speech "comes to the Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)*. Indeed, courts allow this " 'most extraordinary remedy' only where the evil that would result from the [speech] is both great and certain and cannot be militated by less intrusive measures." *CBS, Inc. v. Davis, 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994)* (quoting *Nebraska Press Association v. Stuart, 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)* ). In the instant case, the court concludes that the CEA's registration requirement, as applied to the plaintiffs by the CFTC, is an unconstitutional prior restraint on speech.

*Id.* at 481.

On June 21, 1999, the court, therefore, entered judgment in favor of plaintiffs, finding that the CFTC's application of the CEA's registration requirement to individuals who publish and sell information about the futures market was unconstitutional.

**Award of Attorneys Fees under EAJA**

An award of attorneys fees under the Equal Access to Justice Act ("EAJA") is allowed in the following circumstances:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action ... including proceedings for judicial review of agency action ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C.A. § 2412(d)(1)(A) (1994).

A "party" is defined in pertinent part as follows:

(i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed[.]

28 U.S.C.A. § 2412(d)(2)(B) (1994).

Pursuant to court orders dated July 6, 2001, and October 24, 2001, plaintiffs submitted net worth statements to chambers for *in camera* review. The following chart summarizes plaintiffs' submissions:

| Plaintiff | Receipt of Declaration | Net Worth Less than $2M |
|---|---|---|
| 1. Frank Taucher | No | n/a |
| 2. Stephen Briese | Yes | Yes |
| 3. Frederick J. Kastead [3] | n/a | n/a |

---

**3.** The parties jointly stipulated that, based on certain representations regarding Kastead's publications, the CFTC would not require that

| | | |
|---|---|---|
| (replacing B.A. Thunman) | (Yes) | (Yes) |
| 4. Bruce Babcock (Deceased) | No | n/a |
| 5. Robert Miner | Yes | Yes |
| 6. Galen Cawley | Yes | Yes |
| 7. Arthur Hayner | Yes | Yes |
| 8. Edward Hearne, III | Yes | Yes |
| 9. Roemer McPhee | No | n/a |
| 10. Roger Rines | Yes | Yes |

As is evident from the chart, those plaintiffs who submitted net worth statements meet EAJA's financial eligibility requirement. Plaintiffs Taucher, Briese, and Miner are publishers; Cawley, Hayner, Hearne, McPhee and Rines are subscribers.

### Defendants' Arguments

Defendants argue that plaintiffs should not recover any fees because the defendants' position was substantially justified and, in any event, special circumstances make an award of fees unjust. In the alternative, defendants argue that the subscriber plaintiffs are not prevailing parties and that any fees awarded must be diminished accordingly.[4]

### Whether The Defendants' Position Was Substantially Justified

■ The fundamental question presented is whether the defendants' position was substantially justified, *i.e.,* "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person. That is no different from … [having] a reasonable basis both in law and fact." *Pierce v. Underwood,* 487 U.S. 552,

565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks and citation omitted). *Accord Halverson v. Slater,* 206 F.3d 1205, 1208 (D.C.Cir.2000); *Truckers United for Safety v. Mead,* 201 F.Supp.2d 52, 55 (D.D.C.2002).

### The Defendants' Position

■ According to the defendants, impermissible prior restraints have invoked judicial condemnation as violations of the First Amendment only when they (1) absolutely barred speech or (2) conditioned it upon meeting licensure requirements that were so vague and amorphous that they in fact permitted state censorship because of a dislike of the message conveyed or (3) required the payment of high fees. The defendants insisted that the regulatory scheme in this case did not prevent the publishers from publishing, provided clear and certain standards to be applied by the defendants in making the licensing decision, and required the payment of a reasonable fee. *Defendants' Proposed Findings of Fact and Conclusion of Law* at 52–56. The defendants also insisted that the regulatory scheme at issue was subject

Kastead register with the CFTC as a CTA. *See Taucher v. Born,* 53 F.Supp.2d at 465.

4. Defendants also challenge the adequacy of the documentation tendered in support of the fees, but plaintiffs insist that they can and will provide additional documentation once I have determined that they are entitled to any fees. *Plaintiffs Reply Memorandum of Points and Authorities in Support of Their Application for Attorney and Expert Witness Fees* at 1–2. I

will take plaintiffs at their word and, by an order I will issue with this opinion, I will require that they provide all the documentation to defendants' counsel in the hopes that it will engender either a settlement of the case or at least an agreement as to the amount of the fees to be allowed with the understanding that the defendants will nevertheless be permitted to appeal from any determination that I have made as to their liability.

only to intermediate scrutiny, meaning that it would be upheld if it "advance[d] important governmental interests unrelated to the suppression of free speech and [did] not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). Defendants argued that the statute surpassed this standard easily because it advanced the governmental interest in preventing fraudulent activity without undue interference with any rights the plaintiffs could claim.

### Judge Urbina's Decision

Judge Urbina, however, would have none of it. He saw the regulatory scheme as nothing more than a prior restraint upon speech burdened by a heavy presumption against its validity. The defendants utterly failed to overcome that presumption because the only justification they could provide was their fear that the publishers might publish advice that was fraudulent or misleading. That fear could not possibly justify what the judge called "a drastic prohibition on speech based on the mere possibility that the prohibited speech will be fraudulent." *Taucher*, 53 F.Supp.2d at 482.

### The Regulatory Scheme Created by the Statute Was Unquestionably an Impermissible Prior Restraint

An understanding of the most fundamental First Amendment principles indicates why Judge Urbina was so right and the defendants so wrong. Deeply embedded in the jurisprudence of the First Amendment is the judicial recognition that a central purpose of the adoption of the First Amendment was to prohibit the conditioning of speech upon the securing of a license:

The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historically conceived and guaranteed. In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. The struggle in England, directed against the legislative power of the licence, resulted in renunciation of the censorship of the press. n.4 The liberty deemed to be established was thus described by Blackstone: "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity." 4 Bl. Com. 151, 152; see Story on the Constitution, §§ 1884, 1889.

*Near v. Minnesota*, 283 U.S. 697, 714, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)(footnotes omitted).

■ Given that history, any prior restraint "comes to the Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Indeed, that presumption is so heavy that in that famous case, it would not justify a prior restraint unless there was, at least a showing of, for example, direct, immediate and irreparable damage to the country and its people. *Id.* at 730, 91 S.Ct. 2140 (Stewart, J. concur-

ring).[5] *See CBS, Inc. v. Davis,* 510 U.S. 1315, 1317, 114 S.Ct. 912, 127 L.Ed.2d 358 (1994)(*quoting Nebraska Press Assoc. v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976))(prior restraint permitted only to prevent evil that is "great and certain and cannot be militated by less intrusive means.").

For the defendants to say, in the teeth of this jurisprudence, that prior restraints upon publication are subject to, at most, intermediate scrutiny was to ignore the central principle of the jurisprudence pertaining to prior restraints—that such restraints, *sui generis,* come burdened with a heavy presumption against their constitutionality and therefore have historically been judged by a much more stringent standard than statutes that have an incidental effect on speech. To so misunderstand the controlling law and to equate a prior restraint that conditioned speech upon governmental approval with a statute that had only an incidental effect on speech was to confuse most unreasonably two entirely different principles of First Amendment adjudication.

The defendants certainly did not help themselves by distinguishing the *New York Times* and *Near* cases by saying that, unlike them, this case did not involve "injunctions barring a particular publication." *Defendant's Proposed Findings of Fact and Conclusions of Law* at 52. While the cases did deal with injunctions, their applicability to this case turned on their intense scrutiny of any form of prior restraint, judicial or otherwise, upon a person's speaking. An injunction cannot be distinguished from a licensing system for the purposes of the First Amendment because they both purport to stop a person from speaking unless and until some branch of the government permits him to speak. Thus, the Supreme Court has specifically and unequivocally demanded that the government show the most compelling reason for *any* prior restraint on speech. Once again, the defendants' misstatement of the controlling standard pertaining to the constitutionality of the statute at issue robs its legal position of any substantial justification.

The defendants were also misguided in their assertion that the licensing system at issue in this case was not a prior restraint because it placed adequately defined restrictions on the defendants' power to deny the license, because there were requirements one had to meet, and because the fees one had to pay before speaking or publishing were reasonable. *See Defendants' Proposed Findings of Fact and Conclusions of Law* at 53–55. The cases cited for this proposition (*id.* at 54)[6] do not

---

5. Justice Brennan went further and insisted that any judicial restraint upon publication violated the First Amendment. In his mind, a judicial restraint might be appropriate only if the government could show that the publication to be restrained might cause a nuclear holocaust. *Id.* at 726, 91 S.Ct. 2140 (Brennan, J., concurring).

6. *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) dealt with whether certain provisions of an act regulating lobbying were unconstitutionally vague. In *Master Printers of America v. Donovan,* 751 F.2d 700, 712–14 (4th Cir.1984), the court held that reporting and disclosure requirements of the Labor–Management Reporting and Disclosure Act, 29 U.S.C.A. § 433(b) (1998), did not constitute a prior restraint because they were not a direct restraint on speech. In *Hotel Employees & Restaurant Employees Intern. Union v. Nevada Gaming,* 984 F.2d 1507 (9th Cir.1993), there was no contention that the requirements of a Nevada disclosure law constituted a prior restraint. *Connection Distributing Co. v. Reno,* 154 F.3d 281, 294 (6th Cir.1998), held that the statute at issue did not constitute a prior restraint because the sanctions it provided occurred after publication. In none of these cases did a court say that a prior restraint is acceptable if reasonable.

support it and, in any event, it ignores the central principle that *any* form of restraint upon speaking or publish is a "prior restraint" and therefore not judged by its mere reasonableness. To the contrary, the perfection of the ancient [7] intent of the First Amendment, that in a free society a man be permitted to speak without first being licensed by the government, subjects any prior restraint upon his doing so to a heavy presumption against its legitimacy. The reasonableness of the restraint is, in this sense, irrelevant.

By not realizing how heavy their burden was, the defendants wound up insisting that it was reasonable for them to insist that a government agency had the right to prevent a publication if the agency believed that the publisher had the potential to disregard the requirements of the Commodity Exchange Act or had demonstrated moral turpitude, or a lack of honesty or financial responsibility. *Taucher*, 53 F.Supp.2d at 482. To insist that such an obvious licensing and censoring system passed muster because it was reasonable was to disregard the fundamental constitutional requirement that any such system could only be justified by an overwhelming and immediate governmental necessity. Since the defendants misunderstood their burden, it is hardly surprising that Judge Urbina dismissed their argument so quickly nor should it surprise the defendants that I too find their argument to lack any substantial justification whatsoever.

Nor was defendants' theory that the First Amendment was not even engaged because the statute merely regulated persons who engaged in a particular profession and was similar to bar admission, any more persuasive. Under this theory, it was as appropriate to regulate the publishers, who provided information to commodity investors, as it was to regulate CTA's, who actually managed clients' accounts. To the defendants, the medium was irrelevant; whether it was a published article, a website, or computer software, the message communicated—buy or don't buy this commodity—was the same. Any such communication was as subject to government regulation as any other. Thus, there was no significant difference between the CTA telling a client, who had retained her, to buy cocoa and a published article making the same recommendation. *Defendants' Proposed Findings of Fact and Conclusions of Law* at 42–46.

But, as Holmes pointed out, "every idea is an incitement." *Gitlow v. New York*, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)(Holmes, J., dissenting). If encouraging a person to engage in a particular economic activity is subject to government regulation, irrespective of the medium, or because some of the people who do it have clients who rely upon them for advice, then, *reductio ad absurdum*, the government could regulate what appears in the *Wall Street Journal, Barrons* and *Money Magazine*. These publications all have specific columns providing investment advice and, unless they are wasting their time, hope that their readers will use it. To refuse to see the dif-

7. *See e.g. Lowe v. SEC*, 472 U.S. 181, 205, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985); *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Times Film Corp. v. Chicago*, 365 U.S. 43, 51, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961). As these cases indicate, one source of the principle was John Milton's *Areopagitica, A Speech for the Liberty of Unlicensed Printing to the Parliament of England* (1644). A censor, after all, is: "[a]n official in some countries whose duty it is to inspect all books, journals, dramatic pieces, etc., *before publication,* to secure that they shall contain nothing immoral, heretical, or offensive to the government." Oxford English Dictionary (emphasis added).

ference between the broker who gives her advice to her client and the publisher of a newsletter is to ignore' the cases upon which Judge Urbina relied that discuss the distinction between a professional's advice to a client and a writer's advice to whoever who will read her and use it. *Taucher,* 53 F.Supp.2d at 476–79. That distinction is so self-evident and obvious that the defendants' ignoring it cannot be justified.

## Special Circumstances Do Not Make the Award of Fees Unjust

 As this court has said on a prior occasion:

> A prevailing party in a § 1983 action is generally entitled to attorneys' fees unless special circumstances would render the award unjust. *Hensley,* 461 U.S. at 429, 103 S.Ct. 1933, 76 L.Ed.2d 40; *Grano,* 783 F.2d at 1111 (applying the same rule used in *Commissioners Court v. United States,* 683 F.2d 435, 438 (D.C.Cir.1982)). Special circumstances, however, have been held to be quite rare and the exception is narrowly construed. *Hatfield v. Hayes,* 877 F.2d 717, 719 (8th Cir.1989). See 2 M. Schwartz & J. Kirklin, *Section 1983 Statutory Attorney Fees* § 3.13 (3d ed.1997).

*Turner v. D.C. Board of Elections and Ethics,* 170 F.Supp.2d 1, 4 (D.D.C.2001).

 The defendants find special circumstances in the inability of an administrative agency to declare an act of Congress unconstitutional, from which it follows that an agency, like some sort of Flying Dutchman, is doomed to continue to apply an unconstitutional statute until a district court concludes that the statute is unconstitutional. But, that is an argument in favor of awarding the fees plaintiffs seek. As I pointed out in *Turner,* Congress enacted EAJA to encourage lawyers to undertake litigation to vindicate the constitutional and statutory rights of those who could not otherwise afford to vindicate those rights. *Turner v. D.C. Board of Elections and Ethics,* 170 F.Supp.2d at 5. If, as the defendants have it, agencies are compelled to enforce statutes even if they are unconstitutional, then only lawyers, acting as "private attorney generals" and paid by EAJA, can stop the agencies' unconstitutional behavior. An agency's supposed compulsion to enforce unconstitutional statutes is therefore a circumstance militating in favor of awarding EAJA fees to the lawyers who challenge the agency's conduct rather than a special circumstance precluding such an award.

## EAJA Fees Should Not Be Apportioned On The Present Record

 The parties are agreed that the publishers prevailed and are, therefore, entitled to EAJA fees if any of the other plaintiffs are also so entitled. Defendants would, however, reduce radically their entitlement by insisting that the subscriber plaintiffs were not prevailing parties. If that is true, defendants demand that only the eligible publishers be deemed prevailing parties. As the chart above shows, there are only 3 such publishers and defendants argue that, at best, plaintiffs should only get 30% of the total fees sought; there being a total of ten publishers and subscribers combined.

This approach, if accepted, may have already worked an unfairness. Note that one publisher has died. If he had lived and qualified, there would be 4 eligible plaintiffs and defendants would seek to limit plaintiffs to 40% of the total fees. An approach that grants the defendants a 10% windfall because of the fortuity that one of their opponents died requires the most searching analysis before it can be accepted.

The only case actually accepting such an apportionment is *Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383 (2nd Cir.1985). The problem in this case was that some of the prevailing plaintiffs were EAJA qualified and some were not. In the absence of controlling precedent, that court required the lower court to "determine the number of eligible plaintiffs and award fees based on the ratio of eligible plaintiffs to total plaintiffs." *Id.* at 394. The principle animating such an apportionment is the prevention of a "free ride" by the ineligible plaintiffs at government expense because they had the good sense to join eligible plaintiffs in suing the government. *See American Assoc. of Retired Persons v. EEOC*, 873 F.2d 402, 406 (D.C.Cir.1989).

That is all well and good as a matter of arithmetic, but should the presence of an ineligible plaintiff whose participation is nominal deny the eligible plaintiffs their full entitlement to fees? Two Circuits, including the one that decided *Sierra Club*, indicated that it should not. *United States v. 27.09 Acres of Land*, 43 F.3d 769, 774 (2nd Cir.1994); *Louisiana ex rel. Guste v. Lee*, 853 F.2d 1219, 1225 (5th Cir.1988).

That seems to be the situation here. Judge Urbina devoted the entire analytical portion of his opinion to the constitutionality of the statute's consequences for publishers. Given his analysis of the issues presented and the very nature of the case, I would be stunned to learn from the plaintiffs' documentation that the plaintiffs' lawyers in this case devoted as much time or effort to vindicating the subscribers' rights as they did the publishers'. Yet, if I am right in that supposition, denying plaintiffs' 70% of the fees because of the mere presence of ineligible subscribers for whom they actually did very little works a monumental unfairness.

A much more attractive approach is to realize, as one court has, that the question is not one of arithmetic but of the reasonableness of the fee:

> After reviewing the above cases and the language of EAJA, the Court concludes that apportionment is part of the issue of the reasonableness of the fee. The basic question is whether the actions of the eligible parties and their counsel were reasonable and necessary to the successful prosecution of the case. This is the same inquiry the Court must make whenever it determines any award of attorney fees. Thus, here, the presence of an ineligible co-plaintiff, Wildlife, represented by its own counsel, may affect the reasonableness or necessity of certain expenditures by the eligible parties, but should not result in an automatic adjustment of the attorney fee award.

*Washington Dept. of Wildlife v. Stubblefield*, 739 F.Supp. 1428, 1432 (E.D.Wash. 1989).

Similarly here, I will determine the reasonableness of the fees sought by taking into account all the services performed by plaintiffs' counsel, including their work on behalf of the subscribers, rather than attempting to set some percentage in advance. I leave open the possibility of a hearing at which plaintiffs' counsel will have to testify as to the work done.

## CONCLUSION

I reject the defendants' arguments that their position was substantially justified, that special circumstances make the award of fees unjust, and that the presence of the subscribers as plaintiffs warrants any automatic deduction of any award.

I remain hopeful, particularly now that I have resolved the plaintiffs' basic entitlement to EAJA fees, that the parties may be able to settle this case. To that end, I am ordering plaintiffs' counsel to make

available to defendants' counsel their documented hours and costs. Defendants will be given time to study these materials and to engage in settlement negotiations. If those negotiations fail, I will order plaintiffs to submit an amended fee request to me with a full documentation of their hours and costs. Defendants will then be permitted to oppose that request. Plaintiffs will be permitted a reply and I will resolve the matter.

An Order accompanies this Memorandum Opinion.

## ORDER

Pursuant to the accompanying Memorandum Opinion, it is, therefore, hereby,

**ORDERED** that, by January 3, 2003, plaintiffs' counsel make available to defendants' counsel their documented hours and costs. The parties shall then meet and confer regarding any possibility for settlement and conclude their discussions by January 31, 2003. Should the settlement negotiations fail, plaintiffs shall submit an amended fee request with complete documentation of hours and costs by February 7, 2003. Defendants must file any opposition thereto by February 28, 2002, and plaintiffs may reply by March 7, 2003.

**SO ORDERED.**