# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 8, 2004        Decided January 28, 2005

No. 04-5026

Frank Taucher, et al.,
Appellees

v.

Sharon Brown-Hruska, Acting CFTC Chairman, et al.,
Appellants

---

Appeal from the United States District Court
for the District of Columbia
(No. 97cv01711)

---

*William S. Liebman*, Assistant General Counsel, Commodity Futures Trading Commission, argued the cause for appellants. With him on the briefs was *Kirk T. Manhardt*, Deputy General Counsel.

*Scott G. Bullock* argued the cause for appellees. With him on the brief was *William H. Mellor.*

Before: EDWARDS, HENDERSON, and ROBERTS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROBERTS.

Dissenting opinion filed by *Circuit Judge* EDWARDS.

ROBERTS, *Circuit Judge*: After a federal district court declared a portion of the Commodity Exchange Act unconstitutional, the prevailing parties sought attorneys' fees under the Equal Access to Justice Act. A magistrate judge concluded that the Commodity Futures Trading Commission's defense of the Act was not substantially justified, and accordingly awarded fees to the challengers. On appeal we reject the Commission's argument that it should not be held liable for fees because it was obligated to defend the statute, but we also conclude that the Commission's defense was a reasonable one on the merits. Accordingly, we reverse and vacate the award of attorneys' fees.

## I.

**A.** Congress enacted the Commodity Exchange Act (CEA), Pub. L. No. 74-675, 49 Stat. 1491 (1936), in an effort to combat fraudulent practices affecting the commodity futures market. Section 4m of the CEA as amended, *see* Commodity Futures Trading Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1398, makes it unlawful for any commodity trading advisor (CTA) "to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as [a] commodity trading advisor" unless the CTA is registered under the Act. 7 U.S.C. § 6m(1). Registration is burdensome; those applying to register must submit a substantial amount of background information, renew their registrations annually, maintain books and records for inspection, and undertake mandatory ethics training. *See id.* § 6n; 17 C.F.R. §§ 3.10, 3.34 (1997). The Commodity Futures Trading Commission (CFTC), which implements the Act, can deny, revoke, or suspend registration for a wide variety of reasons. *See* 7 U.S.C. § 12a(2)(A)–(H). It also has discretionary authority to deny registration for "good cause," § 12(a)(3)(M), which can be based on a pattern of conduct by the applicant indicating "moral turpitude, or lack of honesty," even if such conduct has never

been the subject of a formal action or proceeding. 7 C.F.R. pt. 3, app. A (interpreting § 12(a)(3)(M)).

The statutory definition of a CTA subject to these provisions sweeps broadly. It includes those who "for compensation or profit . . . advise[] others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in" commodity futures or "issue[] or promulgate[] analyses or reports concerning" trading in commodity futures. 7 U.S.C. § 1a(6)(A). There is an exemption for "any news reporter, news columnist, or news editor of the print or electronic media," *id.* § 1a(6)(B)(ii), but only if their activities relating to commodity futures are "solely incidental to the conduct of their business or profession," *id.* § 1a(6)(C). The consequences of acting as an unregistered CTA are not trifling: willfully violating Section 4m is a felony punishable by a maximum fine of $500,000 for individuals and as much as five years' imprisonment, *id.* § 13(a)(5), and unregistered CTAs risk civil penalties of $100,000 or triple their monetary gains, whichever is greater. *Id.* § 9.

**B.** On July 30, 1997, certain publishers providing information, analyses, and advice on commodity futures trading filed suit against the chairman and commissioners of the CFTC in their official capacities. Joined by customers who purchased their publications, these plaintiffs sought a declaration that the registration provision was unconstitutional under the First Amendment. The publishers did not dispute that they qualified as CTAs under the statutory scheme. After all, they offered advice on trading in commodity futures through newsletters, books and trading course manuals, Internet-based information services, and software programs. Although the publishers could be considered part of the print or electronic media for purposes of the exemption in 7 U.S.C. § 1a(6)(B), commodity trading advice was central rather than "incidental" to their businesses, and accordingly they could not qualify for the exemption. *See*

*id.* § 1a(6)(c). Each publisher employed a trading system based on technical analysis of commodity price levels and historic trends. The publisher's system played a central role across the spectrum of publications, forming the basis for tips in newsletters and serving as the backbone of software programs generating trading recommendations based on current market data. *See, e.g.*, *Taucher v. Born*, 53 F. Supp. 2d 464, 466–67 (D.D.C. 1999) ("*Taucher I*") (describing a publisher's use of his trading system in his newsletter, book, trading course, and software program).

The publishers' argument was not that they were not covered by the statute, but instead that their various publications were protected under the First Amendment and that the registration requirement constituted a prior restraint on speech prohibited by that Amendment. After rejecting the CFTC's motion to dismiss and the plaintiffs' motion for summary judgment, the district court held a three-day bench trial. In a memorandum opinion and order issued the following month, the court entered judgment in favor of the plaintiffs, declaring the registration requirement unconstitutional as applied to the publishers. *Id.* at 482–83.

The district court first addressed whether Section 4m was a regulation of speech triggering First Amendment scrutiny or was merely a regulation of a profession — that of commodity trading advisor — subject to rational basis review. As the court explained, "[t]his is a question with which courts have struggled in the past in an effort to articulate a principled way of distinguishing between the two kinds of regulations." *Id.* at 476–77. The court looked to Justice Jackson's concurring opinion in *Thomas v. Collins*, 323 U.S. 516 (1945), which noted that while regulation of speech and regulation of a profession "may shade into" one another, "a rough distinction always exists, . . . which is more shortly illustrated than explained." *Id.* at 544 (Jackson, J., concurring). The district court quoted Justice Jackson's view

that "modern regulators sought, at times successfully, to regulate speech by 'associating the speaking with some other factor which the state may regulate so as to bring the whole within official control.' " *Taucher I*, 53 F. Supp. 2d at 479 (quoting 323 U.S. at 547). "[I]t is the court's duty to 'inquire whether [the] speech or publication is properly condemned by association.' " *Id.* (same).

The district court also sought guidance from *Lowe v. SEC*, 472 U.S. 181 (1985), in which the Supreme Court addressed a First Amendment challenge to a registration requirement for securities investment advisors under the Investment Advisors Act (IAA). The *Lowe* majority did not reach the constitutional question, finding that the plaintiffs fell within a statutory exemption for the press. *See id.* at 211. Relying on the legislative history underlying the exemption, the Supreme Court construed it as reaching those whose investment advice was not personalized for clients. *See id.* at 203–11. Although the majority in *Lowe* did not reach the constitutional question, the district court looked to Justice White's separate opinion concurring in the result. Justice White did not think the exemption could be construed to cover the plaintiffs, but would have found the registration requirement an unconstitutional prior restraint of speech as applied to them. He found Justice Jackson's concurrence in *Thomas* "instructive" in "help[ing] to locate the point where regulation of a profession leaves off and prohibitions on speech begin." *Id.* at 231–32 (White, J., concurring in the result). Justice White reasoned that where there was no "personal nexus between professional and client" and a speaker does not exercise judgment on behalf of that client, "government regulation ceases to function as legitimate regulation of professional practice . . . [and] becomes regulation of speaking or publishing as such" subject to heightened scrutiny under the First Amendment. *Id.* at 232.

Finding that the publishers here never exercised judgment or traded commodity futures on behalf of clients and had no personal contact with them, the district court concluded that the registration requirement was a regulation of speech when applied to the plaintiffs. *Taucher I*, 53 F. Supp. 2d at 478–79. Rejecting the claim that the dispute involved commercial speech entitled to lesser First Amendment protection, the court then concluded that the registration scheme was an unconstitutional prior restraint. *Id.* at 480–82. The CFTC appealed the district court's decision, but later agreed to dismiss its appeal because of a new regulation it had promulgated exempting persons like the plaintiff-publishers from registration requirements. *See* 17 C.F.R. § 4.14(a)(9) (2000).

**C.** With its merits victory secured, the plaintiffs' pro bono counsel, a public interest law firm, sought to recover attorneys' fees pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. That Act authorizes an award of fees to a party prevailing against the government unless the government's legal position is "substantially justified or . . . special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The district court referred the matter to a magistrate judge, who correctly read "substantially justified" to mean "justified to a degree that could satisfy a reasonable person" or otherwise having "a reasonable basis both in law and fact." *Taucher v. Rainer*, 237 F. Supp. 2d 7, 11 (D.D.C. 2002) ("*Taucher II*") (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). The magistrate judge spent the bulk of his opinion explaining that Section 4m was "[u]nquestionably" a prior restraint on speech, and that defendants "utterly failed to overcome" the weighty presumption against its validity by casting the registration scheme as a content-neutral regulation advancing important governmental interests unrelated to the suppression of speech. *Id.* at 11–12.

In a more summary fashion, the magistrate judge rejected the substantiality of the CFTC's argument that Section 4m was

a regulation of a profession that did not implicate the First Amendment in the first place. The magistrate judge regarded the difference between "a professional's advice to a client and a writer's advice to whoever will read her and use it" as "so self-evident and obvious that the defendants' ignoring it cannot be justified." *Id.* at 15. Finally, the magistrate judge rejected the argument that the CFTC was excused from paying fees because it had the duty to defend — and the inability to question — the constitutionality of Section 4m. *Id.* Having concluded that the CFTC was liable for fees under EAJA, the magistrate judge awarded plaintiffs' counsel $182,425.55 in fees in a subsequent decision. *Taucher v. Rainer*, 292 F. Supp. 2d 111, 125 (D.D.C. 2003).

The CFTC appeals the magistrate judge's holding that its position was not substantially justified under EAJA and challenges the amount of fees awarded.

## II.

We review a district court's conclusion on substantial justification only for abuse of discretion, even when the district court's judgment turns on an evaluation of questions of law. *Underwood*, 487 U.S. at 560. We have explained, however, that "our deference does not exempt the district court's substantial justification determination from appellate scrutiny." *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 596 (D.C. Cir. 1996) (finding abuse of discretion); *see Halverson v. Slater*, 206 F.3d 1205 (D.C. Cir. 2000) (same). "We will reverse the district court if its decision rests on clearly erroneous factual findings or if it leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *F.J. Vollmer*, 102 F.3d at 596 (internal quotation marks omitted).

EAJA provides, in relevant part, that "a court shall award to a prevailing party other than the United States fees and other

expenses . . . incurred by that party in any civil action . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Although the CFTC questions whether the subscriber-plaintiffs were prevailing parties — the district court found it unnecessary to consider their claims as distinct from the publishers' claims — it is undisputed that the publishers prevailed in the merits litigation. Once an applicant's status as a prevailing party is established, the government has the burden of showing that its legal position was substantially justified or that special circumstances make an award unjust. *Air Transp. Ass'n of Canada v. FAA*, 156 F.3d 1329, 1332 (D.C. Cir. 1998).

The government's position is substantially justified if it is "justified to a degree that could satisfy a reasonable person" or, in other words, has "a reasonable basis both in law and fact." *Underwood*, 487 U.S. at 565 (internal quotation marks omitted). Although the strength of the government's position in the litigation obviously plays an important role in a substantial justification evaluation, the reasonableness inquiry "may not be collapsed into [an] antecedent evaluation of the merits, for EAJA sets out a distinct legal standard." *Cooper v. United States R.R. Ret. Bd.*, 24 F.3d 1414, 1416 (D.C. Cir. 1994) (internal quotation marks omitted). The statutory structure assumes that the government can lose on the merits and nevertheless be found to have taken a substantially justified position. Underwood, 487 U.S. at 569. *See De Allende v. Baker*, 891 F.2d 7, 12 (1st Cir. 1989) ("The mere fact that the government lost in the underlying litigation does not create a presumption that its position was not substantially justified."). "To be 'substantially justified' means, of course, more than merely undeserving of sanctions for frivolousness," *Underwood*, 487 U.S. at 566, but at the same time the standard does not "require the Government to establish that its decision to litigate was based on a substantial probability of prevailing." *Spencer v. NLRB*, 712 F.2d 539, 557

(D.C. Cir. 1983) (quoting H.R. Rep. No. 96-1418, at 10–11 (1980)).

Here as in other areas courts need to guard against being "subtly influenced by the familiar shortcomings of hindsight judgment." *Beck v. Ohio*, 379 U.S. 89, 96 (1964). *Cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978) (courts must "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"). Not all opinions can aspire to what was said of those of Justice Brandeis — that in them "the right doctrine emerges in heavenly glory and the wrong view is consigned to the lower circle of hell," HENRY J. FRIENDLY, *Mr. Justice Brandeis — The Quest for Reason, in* BENCHMARKS 291, 294 (1967) — but there is always the hope that, after decision, the "wrong view" looks considerably less plausible than it did before. But just as discovery of contraband does not establish probable cause, nor an accident negligence, nor poor returns an imprudent trustee, so too a loss on the merits does not mean that legal arguments advanced in the context of our adversary system were unreasonable.

Our EAJA jurisprudence reflects this principle. It "requires that the district court do more than explain, repeat, characterize, and describe the merits . . . decision." *Halverson*, 206 F.3d at 1209. Courts evaluating substantial justification must instead analyze *why* the government's position failed in court: if, for example, the government lost because it vainly pressed a position "flatly at odds with the controlling case law," *Am. Wrecking Corp. v. Sec. of Labor*, 364 F.3d 321, 326–27 (D.C. Cir. 2004) (internal quotation marks omitted), that is one thing; quite another if the government lost because an unsettled question was resolved unfavorably. *See United States v. Hallmark Constr. Co.*, 200 F.3d 1076, 1080 (7th Cir. 2000) ("the district court must reexamine the legal and factual circumstances

of the case from a different perspective than that used at any other stage of the proceeding").

## III.

The CFTC's first argument was presented to the district court not under the guise of "substantial justification" at all, but instead as a "special circumstance" making the award of fees "unjust" in this case. *See* 28 U.S.C. § 2412(d)(1)(A). The CFTC argued that it had a duty to defend the constitutionality of Section 4m, and that it would be unjust to award fees against it simply for faithfully undertaking this duty. *See Taucher II*, 237 F. Supp. 2d at 15. On appeal, the CFTC merged this contention with its substantial justification claim. *See* Reply Br. at 16 ("The Commission understands that it still must pass the substantial justification test.").

The CFTC argues that the merits suit is best seen not as a challenge to a discretionary agency action directed against any particular plaintiff, but rather an attack on the validity of a congressionally enacted statute as applied to the plaintiffs. The CFTC argues — and the district court agreed — that unlike the situation in *Lowe*, the statutory scheme at issue here does not lend itself to an interpretation exempting the plaintiffs from registration. *See Taucher I*, 53 F. Supp. 2d at 475–76 (concluding Section 4m applied to publisher-plaintiffs). In other words, the judgment that these publishers should register was made by Congress, not the CFTC. The CFTC notes that acts of Congress are presumed to be constitutional, *see*, *e.g.*, *United States v. Morrison*, 529 U.S. 598, 607 (2000), and that administrative agencies generally do not have jurisdiction to question the constitutionality of their governing statutes. *See*, *e.g.*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994); *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 242 (1968) (Harlan, J., concurring in result).

From these premises, however, the CFTC draws a suspect conclusion: that its inability to question the presumptive constitutionality of Section 4m renders its position substantially justified under EAJA. It seeks support for this conclusion in the following observation, made by this court two decades ago:

> [T]he prospect of judicial review of legislation for constitutionality does not relieve Congress of the obligation to self-police its measures for compatibility with the Constitution. Therefore, *situations in which the government's defense of the constitutionality of a federal statute fails the "substantially justified" test should be exceptional*.

*Grace v. Burger*, 763 F.2d 457, 458 n.5 (D.C. Cir. 1985) (emphasis added). The CFTC argues that because it has a duty to execute faithfully the laws passed by Congress, it should not be penalized for undertaking that constitutional obligation. *See Kiareldeen v. Ashcroft*, 273 F.3d 542, 549 (3d Cir. 2001) ("We conclude that [the Executive Branch] is duty-bound to defend what Congress has enacted, and was therefore substantially justified in defending the constitutionality of this statute.").

Circuit precedent provides no support for the Commission's duty-to-defend argument. Rather than promulgating the rule the CFTC proposes, the underscored language from our footnote in *Grace* simply emphasizes that this court presumes that Congress typically attends to its obligation to legislate within the bounds of the Constitution. Indeed, the text to which footnote 5 was appended explained that "we do not rule . . . that the government is forever and always 'substantially justified' in defending in court the constitutionality of an act of Congress, whatever the statute may say, and on any ground a legal mind might conceive." 763 F.2d at 458. *See also League of Women Voters v. FCC*, 798 F.2d 1255, 1259 (9th Cir. 1986) ("neither the language of the EAJA nor its legislative history support . . . exceptions for constitutional attacks on statutes"). The CFTC's duty to defend the constitutionality of Section 4m explains, at

most, *why* the CFTC took the position it did. The question under EAJA remains whether that position was substantially justified.

## IV.

The CFTC's main contention is that the district court abused its discretion in finding the argument that Section 4m was a valid regulation of a profession rather than a restraint on speech to be not substantially justified. Focusing on whether the registration scheme was an unconstitutional prior restraint, the magistrate judge devoted less attention to the separate and antecedent question of whether Section 4m was a regulation of speech that implicated the First Amendment at all. *See Taucher II*, 237 F. Supp. 2d at 12–15. On that question, the magistrate judge wrote that refusing to appreciate the difference between brokers giving advice to clients and the publication of a newsletter was "to ignore the cases upon which [the district court] relied that discuss the distinction between a professional's advice to a client and a writer's advice to whoever . . . will read her and use it." *Id.* at 14–15. According to the magistrate judge, this difference was "self-evident and obvious." *Id.* at 15.

In considering substantial justification under EAJA, however, it is not enough to repeat the analysis of the merits decision, and add adjectives. *See Halverson*, 206 F.3d at 1209; *F.J. Vollmer*, 102 F.3d at 596. "[T]he district court must analyze the merits . . . reasoning to determine whether the [government's] position, though rejected, was substantially justified." *Halverson*, 206 F.3d at 1209. Here such an analysis of the merits reasoning might begin with the fact that "the cases upon which [the district court] relied" consist of two concurring opinions. Well reasoned, to be sure, and perhaps ultimately persuasive, but — to paraphrase the Supreme Court's dismissal of non-majority views in another case — the comments in the concurring opinions are just that: comments in concurring

13

opinions. *See United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 177 n.10 (1980).

What is more, while the magistrate judge found the distinction drawn in the two concurrences "self-evident and obvious," *Taucher II*, 237 F. Supp. 2d at 15, the concurring opinions themselves belie that assertion. Justice Jackson acknowledged that the distinction between permissible regulation and unconstitutional suppression of speech was a "rough" one, with the two areas "shad[ing]" into one another, and that the distinction was "more shortly illustrated than explained." *Thomas*, 323 U.S. at 544 (concurring opinion). Justice Jackson's analysis highlighted the fact-specific nature of the inquiry, noting that a court can draw the pertinent line only after deciding whether the speech has been "properly condemned by association" with a non-speech factor open to state regulation. *Id.* at 547. "Whether in a particular case the association or characterization is a proven and valid one," Justice Jackson acknowledged, "often is difficult to resolve." *Id.* Justice White recognized that Justice Jackson "wrestled" with the issue, and that the question was a line-drawing one of "locat[ing] the point where regulation of a profession leaves off and prohibitions on speech begin." *Lowe*, 472 U.S. at 231–32 (concurring opinion). Hardly the language of a "self-evident and obvious" distinction.

Nor is there any indication that the district court judge regarded the matter as so open-and-shut as did the magistrate judge. The former's opinion lacks the adjectives that populate the latter's; the district judge appreciated that the distinction the magistrate judge found "so self-evident and obvious" was one "with which courts have struggled in the past." *Taucher I*, 53 F. Supp. 2d at 476. The district court also appreciated that the *Lowe* concurrence was "perhaps not conclusive" and only "instructive" on how to draw the line between regulation of a profession and regulation of speech. Order Den. Pls.' Mot. for Summ. J. (Jan. 14, 1999) at 2 [JA 56]. The district court did not

regard the *Lowe* concurrence as stating a well-established rule; the Justices who joined it were instead "searching for a way to distinguish between the regulation of a profession and the regulation of speech." *Id.*

The plaintiffs argue, however, that because the *Lowe* majority "clearly implied" that the IAA registration scheme would have been unconstitutional had it been "applied to . . . impersonal investment advisers," *Lowe* dictates that the CEA registration scheme violates the First Amendment. Br. at 17 (citing 472 U.S. at 210). The district court's merits opinion drew a similar inference, reasoning that the *Lowe* majority — in construing the IAA as it did to avoid a conflict with the First Amendment — "alluded to the correctness" of a conclusion that Section 4m was unconstitutional. *Taucher I*, 53 F. Supp. 2d at 481–82. Such "allusions" are properly the stuff from which to draw guidance in resolving open legal questions, but the very fact that such inferences must be drawn confirms the absence of controlling legal authority. After all, the whole point of the constitutional avoidance in which the *Lowe* majority expressly engaged, *see* 472 U.S. at 190 & n.24, is to *avoid* deciding the constitutional question. It is a bit much to argue that the *Lowe* majority provided constitutional guidance so clear that fees should be awarded against those who failed to heed it, even under a different statute regulating a different business than the one at issue in *Lowe*, when the basis for the opinion was the need to avoid a constitutional decision altogether. The *Lowe* majority opinion, while helpful and apposite, did not govern the disposition of the case. *See CFTC v. Vartuli*, 228 F.3d 94, 104–05 (2d Cir. 2000) ("*Lowe* provides us with neither a binding interpretation of the CEA . . . nor a constitutional analysis of [the IAA]").

Moreover, the magistrate judge was wrong to suggest that the defendants "ignore[d]" the cases on which the district court had relied. The defendants confronted the guidance the district

court sought from *Lowe* head on, and attempted to distinguish it. Relying heavily on the IAA's legislative history, the *Lowe* majority explained that the IAA was meant to cover "the business of rendering personalized investment advice," not "nonpersonalized publishing activities." 472 U.S. at 204. The defendants explained that the difference between a traditional personalized trader and a publisher specializing in trading advice is markedly less sharp in the commodity futures business than in the securities market addressed by *Lowe*. In the commodity futures market, the relationship between trader and client is quite impersonal. CTAs are rarely in contact with their clients. They generally do not obtain detailed financial information from clients, evaluate the suitability of clients to engage in trading, or communicate trading advice. Transactions are rarely pre-approved by individual clients and rarely tailored to their needs. *See Taucher I*, 53 F. Supp. 2d at 465–66 (factual findings on the CTA-client relationship).

Securities and commodity futures trading are similar enough to invite comparison, but the differences between the two markets render any analogy less than airtight. This consideration is particularly weighty when reviewing the reasonableness of the government's position in litigation over the boundaries between permissible economic regulation and unconstitutional infringement on speech rights — disputes in which factual distinctions concerning the nature of particular markets can carry the day. *Compare, e.g., Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997) (upholding the constitutionality of a mandatory advertising fee — for peaches — against First Amendment challenge because pertinent market was comprehensively regulated) *with United States v. United Foods, Inc.*, 533 U.S. 405 (2001) (striking down a similar mandatory advertising fee on First Amendment grounds because market — for mushrooms — was not as pervasively regulated as the one in *Glickman*).

In the absence of controlling Supreme Court case law, the available circuit precedent becomes more significant in considering substantial justification under EAJA. During pre-litigation enforcement of Section 4m and when the plaintiffs filed suit, the only appellate decision addressing the constitutionality of requiring a publisher of a commodity futures newsletter to register as a CTA had upheld Section 4m against a First Amendment challenge. *See Savage v. CFTC*, 548 F.2d 192, 197–98 (7th Cir. 1977). The argument considered and rejected in *Savage* was that

> a statutory requirement that a license be obtained in order to publish information and opinions regarding the commodities markets is an unwarranted impairment of First Amendment rights of freedom of speech and press; that the First Amendment covers newsletters even though they are published in anticipation of economic gain; and that prior restraints are presumed illegal especially where, as here, the Commission seeks to prohibit publication of a newsletter without any evidence whatsoever that it was used in a deceptive or fraudulent manner.

*Id.* at 196.

The plaintiffs argue that *Savage* is distinguishable because there the plaintiff also had personal contacts with his clients. Br. at 26 n.3. In rejecting the constitutional challenge, however, the *Savage* opinion — written well before Justice White's concurrence in *Lowe* — placed no weight whatever on that fact. *See Savage*, 548 F.2d at 197. The fact that the Seventh Circuit itself narrowed a broad reading of *Savage after* the merits decision below, *see Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 990 (7th Cir. 2000), or suggested such a narrowing during the merits briefing below, *see Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 686 (7th Cir. 1998), does not alter the reasonableness of the CFTC's position in this case.

17

\* \* \*

In sum, when this suit was filed, there was no controlling Supreme Court authority or D.C. Circuit precedent on the constitutionality of Section 4m as applied to publishers of commodity futures trading advice. The only circuit authority — although arguably distinguishable — had *upheld* the provision in the face of a First Amendment challenge. The theory on which the publishers relied in arguing that Section 4m was unconstitutional as applied to them had been articulated not in a Supreme Court majority opinion but in two separate concurrences. These concurrences themselves had recognized that the line between regulation of a profession and regulation of speech was not easy to discern. And even if the two concurrences did state the applicable test, the nature of the commodity futures market presented a substantial factual basis for supposing that applying the test might lead to a different result than the one argued for by the plaintiffs.

Contrast this with cases in which we have found the government's position not to be substantially justified. Given the precedent at the time of litigation, the CFTC's position was neither "patently flawed" nor "flatly at odds with the controlling case law." *Am. Wrecking Corp.*, 364 F.3d at 326–27 (internal quotation marks omitted). It was not "obviously insufficient under well-established precedent," or pressed "[i]n the face of an unbroken line of authority." *Precision Concrete v. NLRB*, 362 F.3d 847, 851–52 (D.C. Cir. 2004). The CFTC did not act in defiance of a "string of losses." *Contractor's Sand & Gravel, Inc. v. FMSHRC*, 199 F.3d 1335, 1341 (D.C. Cir. 2000) (internal quotation marks omitted). *See also Halverson*, 206 F.3d at 1211 (government's position "entirely without merit"); *F.J. Vollmer*, 102 F.3d at 596 (government's position "required treating identical weapons in completely different ways"). Morever, given the differences between the securities and commodity futures trading markets, it cannot be said that the CFTC's

argument lacked a reasonable factual basis in the record, *Cooper*, 24 F.3d at 1416–17, even if the *Lowe* concurrence governed. We are confident that the CFTC's position — though rejected — was nonetheless "justified to a degree that could satisfy a reasonable person," *Underwood*, 487 U.S. at 565, and that it was an abuse of discretion to conclude otherwise.

The decision of the district court is reversed and the award of attorneys' fees is vacated.

EDWARDS, *Circuit Judge*, *dissenting*: The Equal Access to Justice Act ("EAJA") provides that:

> a court shall award to a prevailing party . . . fees and other expenses . . . incurred by that party in any civil action . . . brought by or against the United States . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (2000). The Supreme Court's decision in *Pierce v. Underwood*, 487 U.S. 552 (1988), clearly and firmly controls the level of involvement by the courts of appeals in the application of this statutory provision.

In *Underwood*, the Court instructed that, in considering whether the Government's litigating position was "substantially justified" within the meaning of EAJA, a court of appeals does not engage in *de novo* review. *Id*. at 557-63. Rather, a district court's judgment that fees are due to a prevailing party under EAJA is entitled to significant deference under an abuse-of-discretion standard. *Id*. Indeed, the Court made it clear that, even when "the attorney's fee determination . . . involve[s] a judgment ultimately based upon evaluation of the purely legal issue governing the litigation," the district court's judgment is still subject only to the most limited review. *Id*. at 560.

In reaching this conclusion, the Court in *Underwood* was counseled by considerations of "sound judicial administration." *Id*. at 563. Specifically, the Court sought to avoid the "unusual expense" associated with requiring an appellate court to "undertake the unaccustomed task of reviewing the entire record, not just to determine whether there existed the usual minimum support for the merits determination made by the factfinder below, but to determine whether urging of the opposite merits determination was substantially justified." *Id*. at 560. The Court indicated that this would be a poor use of

court of appeals resources, because it "will either fail to produce the normal law-clarifying benefits that come from an appellate decision on a question of law, or else will strangely distort the appellate process." *Id*. at 561. In short, *Underwood* was quite plain in saying that the courts of appeals have no business second-guessing district court determinations whether the Government's litigating position was "substantially justified" within the meaning of EAJA.

Thus, under *Underwood*, a district court's judgment may be reversed only when the record "*commands* the conclusion that the Government's position was substantially justified." *Id*. at 570-71 (emphasis added). Why such a tight rein on the standard of review? It is really quite simple. The abuse-of-discretion standard of review is required because judgments on what is substantially justified are inherently discretionary and therefore not reasonably susceptible to more probing review. *Id*. at 561-62. In other words, as the Court said in *Underwood*, the "substantially justified" formulation admits of no "useful generalization." *Id*. at 562. Therefore, "'[o]ne of the "good" reasons for conferring discretion on the trial judge is the sheer impracticability of formulating a rule of decision for the matter in issue.'" *Id*. at 561 (quoting Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above,* 22 SYRACUSE L. REV. 635, 662 (1971)).

There is no doubt that we are bound to follow the principles enunciated in *Underwood*. And adherence to *Underwood* means that our review of the District Court's decision is narrow, limited, and deferential. Under this standard of review, there is no conceivable way that the record in this case can be seen to "command" the conclusion that the Government's position was substantially justified.

\* \* \* \*

The merits litigation in this case did not pose a difficult legal issue. The Commodity Futures Trading Commission ("Commission") had been enforcing a provision under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6m(1), that required all Commodity Trading Advisors ("CTAs") to register. The disputed legislation provided that "[i]t shall be unlawful for any commodity trading advisor . . . unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor." 7 U.S.C. § 6m(1). Two groups of plaintiffs challenged the Commission's enforcement of this provision. One group, the "publishers," was composed of persons who published nonpersonalized books, newsletters, Internet sites, instruction manuals, and computer software that provided information, analysis, and advice on commodity futures trading. The publishers did not service individual clients or execute trades on behalf of any clients. The second group, the "subscribers," was composed of members of the public who read and used the publishers' publications. The gravamen of the complaint was that, while the publishers' actions made them CTAs under the CEA, the application of the CEA's registration requirement to them, as opposed to the more typical account-managing CTAs, constituted an unconstitutional prior restraint infringing their freedom of speech under the First Amendment.

The District Court held that the publications at issue were "fully protected speech," as opposed to "commercial speech." *Taucher v. Born*, 53 F. Supp. 2d 464, 480-81 (D.D.C. 1999). The District Court concluded that, as a prior restraint on fully protected speech, the registration requirement could not survive the searching scrutiny applied to such restraints. *Id.* at 481-82. On August 19, 1999, the Commission appealed the District Court's decision to this court, where the case was briefed and scheduled for oral argument. However, prior to argument, the

4

Commission adopted regulations exempting persons like the publishers in this case from the registration requirement, thereby mooting the case. *See* 17 C.F.R. § 4.14(a)(9) (2004) (adopted Mar. 10, 2000). The parties then agreed to voluntarily dismiss the appeal. *See Taucher v. Rainer*, No. 99-5293, 2000 WL 516081 (D.C. Cir. Mar. 28, 2000) (per curiam), *reprinted in* Joint Appendix at 149.

It is hardly surprising that the Government elected not to appeal the District Court's judgment on the merits, for that judgment was eminently correct and unassailable. Nor is it surprising that, in holding the Government liable under EAJA, the Magistrate Judge who heard and decided the case found that the Commission's position in the merits litigation was baseless and thus not substantially justified. *See Taucher v. Rainer*, 237 F. Supp. 2d 7 (D.D.C. 2002).

The Magistrate Judge first noted that the Commission seemed not to recognize that the registration requirement, as a prior restraint, was subject to more than "intermediate scrutiny":

> For the defendants to say, in the teeth of this jurisprudence, that prior restraints upon publication are subject to, at most, intermediate scrutiny was to ignore the central principle of the jurisprudence pertaining to prior restraints – that such restraints, *sui generis*, come burdened with a heavy presumption against their constitutionality and therefore have historically been judged by a much more stringent standard than statutes that have an incidental effect on speech. To so misunderstand the controlling law and to equate a prior restraint that conditioned speech upon governmental approval with a statute that had only an incidental effect on speech was to confuse most unreasonably two entirely different principles of First Amendment adjudication.

*Id*. at 13.  The Magistrate Judge then held that the Commission was not substantially justified in its position that the disputed registration restriction constituted a permissible professional regulation, as opposed to an impermissible regulation of speech:

> Under [the Commission's] theory, it was as appropriate to regulate the publishers, who provided information to commodity investors, as it was to regulate CTA's, who actually managed clients' accounts.  To the defendants, the medium was irrelevant; whether it was a published article, a website, or computer software, the message communicated – buy or don't buy this commodity – was the same.   Any such communication was as subject to government regulation as any other.   Thus, there was no significant difference between the CTA telling a client, who had retained her, to buy cocoa and a published article making the same recommendation.

> But, as Holmes pointed out, "every idea is an incitement." *Gitlow v. New York*, 268 U.S. 652, 673 (1925) (Holmes, J., dissenting).  If encouraging a person to engage in a particular economic activity is subject to government regulation, irrespective of the medium, or because some of the people who do it have clients who rely upon them for advice, then, *reductio ad absurdum*, the government could regulate what appears in the *Wall Street Journal*, *Barrons* and *Money Magazine*. These publications all have specific columns providing investment advice and, unless they are wasting their time, hope that their readers will use it. To refuse to see the difference  between the broker who gives her advice to her client and the publisher of a newsletter is to ignore the cases upon which Judge Urbina relied that discuss the distinction between a professional's advice to a client and a writer's advice to whoever who will read her and use it. *Taucher*, 53 F. Supp. 2d at 476-79.   That

distinction is so self-evident and obvious that the defendants' ignoring it cannot be justified.

*Id*. at 14-15 (citations omitted).

In essence, the Magistrate Judge found that, because the Government's positions in the merits litigation bordered on the absurd, the positions could not possibly be "substantially justified." The Judge was quite correct on both counts.

Before this court, the Government offered nothing of substance to suggest that the Magistrate Judge's decision reflected an abuse of discretion. Rather, the Government's brief to this court offered a new ploy, suggesting that the Commission was "duty-bound" to defend the constitutional challenge to the CEA and that this constituted substantial justification for its position. Commission's Br. at 27-36. This argument is specious. In *Grace v. Burger*, 763 F.2d 457 (D.C. Cir. 1985), this court did state in a footnote that "situations in which the government's defense of the constitutionality of a federal statute fails the 'substantially justified' test should be exceptional." *Id*. at 458 n.5. However, the context reveals that the court intended this statement not as a normative principle, but merely as a prediction, noting that Congress is under an "obligation to self-police its measures for compatibility with the Constitution." *Id*. Thus, the court simply stated its expectation that it would be rare that Congress would enact a statute so clearly unconstitutional that an agency would not be substantially justified in defending it. Indeed, in the main text of the opinion, the court explicitly stated:

[W]e do not rule, nor did the district court, that the government is forever and always "substantially justified" in defending in court the constitutionality of an act of Congress, whatever the statute may say, and on any ground

a legal mind might conceive. As we have explained, the government bears the burden on the substantial justification plea, and to carry that burden, the government must demonstrate that its litigation position had a solid basis in fact and law.

*Id*. at 458 (footnote and citation omitted).

The Government also contends that its defense of the unconstitutional registration requirement was substantially justified because its position found support in the Seventh Circuit's 1977 decision in *Savage v. CFTC*, 548 F.2d 192 (7th Cir. 1977). This, too, is a specious argument. If considered in isolation, *Savage* does indeed provide some support for the Commission's position. However, *Savage* was completely undermined by the Supreme Court's later decision in *Lowe v. SEC*, 472 U.S. 181 (1985). In *Lowe,* the Court held that the petitioners could not be permanently enjoined from publishing nonpersonalized investment advice and commentary in securities newsletters for the reason that they were not registered as investment advisers under § 203(c) of the Investment Advisers Act. The majority opinion by Justice Stevens held that, because petitioners' publications fell within the statutory exclusion for bona fide publications, none of the petitioners was an "investment adviser" as defined in the Act.

Justice White wrote a long concurring opinion in *Lowe*, in which Chief Justice Burger and then-Justice Rehnquist joined, concluding that the prior restraint of the publishers was forbidden under the First Amendment. *Id*. at 211-36 (White, J., concurring in result). Justice White focused on the point where regulation of a profession leaves off and prohibitions on speech begin:

One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession. If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny. Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command . . . .

*Id*. at 232 (footnote omitted) (White, J., concurring in result).

Justice White's concurring opinion in *Lowe* did not rest on novel statements of law; it was grounded in decades of Supreme Court precedent. *See*, *e.g.*, *id.* at 229-30 (White, J., concurring in result) (discussing the relevant precedent and citing a number of cases in which the Supreme Court struck down prior restraints on ostensibly professional speech). And the concurring opinion in *Lowe* is consistent with the majority opinion. Indeed, although the majority opinion decided the case on statutory grounds, it strongly suggested that application of the disputed statute to publishers of nonpersonalized investment advice would be unconstitutional. *See id.* at 226 (White, J., concurring in result) ("One does not have to read the Court's opinion very

closely to realize that its interpretation of the Act is in fact based on a thinly disguised conviction that the Act is unconstitutional as applied to prohibit publication of newsletters by unregistered advisers.").

\* \* \* \*

The abuse-of-discretion standard obviously does not mean that a district court's exercise of discretion is unreviewable. *See United States v. Criden*, 648 F.2d 814, 817-19 (3d Cir. 1981). "'[U]nreviewable discretion offends a deep sense of fitness in our view of the administration of justice.'" *Id.* at 818 (quoting Rosenberg, *supra*, at 641-42). What it does mean, however, is that review is substantially limited, especially when, as with cases under EAJA, litigating circumstances vary so much that it is difficult to frame generally applicable principles constricting the trial court's exercise of discretion. At bottom, the abuse-of-discretion standard focuses on the reasonableness of the trial court's judgment, and the measure of reasonableness depends upon the facts of each particular case before the court. *Id.* at 817-18.

As noted above, under EAJA, a district court's judgment that fees are due to a prevailing party is entitled to significant deference because the "substantially justified" formulation admits of no "useful generalization." *Underwood*, 487 U.S. at 562. With this in mind, the Court in *Underwood* found that, when the "objective indicia" in a case (such as "the objective fact that the merits were decided at the pleadings stage") fail to provide a "conclusive answer," *id.* at 568, and the district court's exercise of discretion rests on a view of the facts and the law that is not unreasonable, *id.* at 568-571, the appellate court cannot find that the district court abused its discretion. It does not matter whether the appellate court agrees or disagrees with

the trial court. All that matters is that the trial court's judgment rests on a reasonable view of the record before it.

In this case, the Magistrate Judge found that the Government's positions in the merits litigation were far from substantially justified, because they were largely baseless. If the decision were mine to make, I would hold that the Government's positions bordered on frivolous. But my job here is not to make that decision. Rather, as the Court in *Underwood* instructed, my colleagues and I are limited to determining only whether the District Court's judgment amounts to an abuse of discretion. I think it is absolutely clear on the record at hand that the District Court's judgment in this case cannot be found wanting under any accepted construction of the abuse-of-discretion standard of review. Appellees were properly awarded fees under EAJA, and the judgment in their favor should be affirmed.